875 So.2d 383 (2004)
Esig PERLOW, Petitioner,
v.
Sharon H. BERG-PERLOW, et al., Respondents.
No. SC02-1317.
Supreme Court of Florida.
March 25, 2004.
Rehearing Denied June 10, 2004.
Richard A. Kupfer, West Palm Beach, FL, for Petitioner.
Joel M. Weissman, Doreen M. Yaffa, and Denise C. Desmond, West Palm Beach, FL, for Respondent.
QUINCE, J.
We have for review Perlow v. Berg-Perlow, 816 So.2d 210 (Fla. 4th DCA 2002), which expressly and directly conflicts with the decision in Rykiel v. Rykiel, 795 So.2d 90 (Fla. 5th DCA 2000), quashed on other grounds, 838 So.2d 508 (Fla.2003). We have jurisdiction. See art. V, § 3(b)(3), *384 Fla. Const. For the reasons stated below, we quash the decision of the Fourth District and hold that in a marital dissolution proceeding: (1) the trial judge may ask both parties or one party to submit a proposed final judgment; (2) if proposed final judgments are filed, each party should be given an opportunity to review the other party's proposed final judgment and make objections; (3) if only one party submits a proposed final judgment, there must be an opportunity for review and objections by the opposing party; and (4) prior to requesting proposed final judgments, the trial judge should, when possible, indicate on the record the court's findings of fact and conclusions of law.

FACTUAL AND PROCEDURAL HISTORY
Esig Perlow (the husband) and Sharon Berg-Perlow (the wife) were married in 1986, and their only child, Adam, was born in 1991. At one time the parties resided in California where the husband was an attorney.[1] In 1998 the wife commenced divorce proceedings. The husband's first lawyer filed a financial affidavit on his behalf showing his income for 1996 to be $177,000 and for 1997, the year preceding the petition, slightly less.
Initially, the wife sought primary custody of Adam with shared parental responsibility and liberal visitation to the husband. However, during the dissolution, Adam's behavior worsened, and he became verbally and physically abusive both with the wife and at his school. The record shows that the husband actively and repeatedly undermined Adam's psychological treatment, including threatening Adam's psychologist. Therefore, the wife sought and obtained increasingly limited interaction between Adam and the husband.
Before the final hearing, three different attorneys represented the husband. The last attorney, Ken Renick, filed a motion for temporary fees and costs on the husband's behalf but with the court's permission withdrew from representation before the motion was heard. The husband proceeded pro se thereafter. On December 19, 1999, more than two months before the final hearing, the trial judge conducted a hearing on the husband's motion for temporary attorney's fees. Renick, who had already withdrawn from representation, appeared and testified at that hearing as to the amount of attorney's fees that he estimated would be incurred in representing the husband in the dissolution proceeding. The husband gave sworn testimony at the hearing that he did not have the financial resources to hire an attorney but failed to present an attorney to testify as to the attorney's willingness to represent him and the amount of attorney's fees sufficient for his representation. The husband testified that $123,000 of the $177,000 income reported on his financial affidavit for the year 1996 was in dispute. He claimed that he had filed an amended financial affidavit. However, the trial judge could not find the amended affidavit in the court file, and the wife's counsel denied having received a copy of it. The husband testified that he had no income during the years 1997, 1998, and 1999 due to a heart condition and that he had declared bankruptcy.
The trial judge found that, because the husband had failed to show an obligation to pay attorney's fees or to show that the absence of an anticipatory award prevented him from obtaining counsel, he had *385 failed to demonstrate need. The judge also explained that he did not have sufficient evidence to determine the amount of an award because there was no evidence as to the hourly rate that would be charged by an attorney who would be willing to represent the husband. The court order provided that the husband's request for temporary attorney's fees was denied without prejudice to allow the husband to seek temporary attorney's fees after retaining counsel should he do so. No further request for fees was made between December 19, 1999, and February 22, 2000.
On February 22, 2000, the case proceeded to trial. On the opening day of the trial, the husband made a motion for a continuance, which the trial judge denied. The husband then absented himself from the proceedings without leave of the judge, and the wife began presentation of her case in the husband's absence. After the lunch recess, the husband reappeared and moved for temporary attorney's fees. Although the husband presented an argument to the judge, he failed to present any evidence. Therefore, the judge denied his motion for temporary attorney's fees. However, the judge informed the husband that he would hear his motion for attorney's fees if he returned the following day with an attorney.
On the following day as instructed, the husband appeared in court with an attorney, Peggy Rowe-Linn, and the judge recessed the trial proceedings. The judge informed Rowe-Linn that when the husband indicated that he did not have sufficient funds to retain an attorney to represent him, the judge informed the husband that he would have to have an attorney join the case and state to the judge that the attorney would be willing to handle the case for the husband. The judge stated that, after a cursory review of the financial affidavits, it appeared "somewhat likely" that he would reserve jurisdiction for fees and that the husband might be entitled to fees and costs when the case was concluded. Finally, the judge stated to Rowe-Linn that the ultimate question was whether she wanted to take the case knowing that it was uncertain whether she would ultimately get paid. The judge stated that he could not delay the trial or continue it. Rowe-Linn responded that, if this were an instance where the only funding of the litigation were to occur after the entry of a final judgment on a reservation of fees, not only would she refuse to take the case, but every attorney in Palm Beach County would refuse it as well, since this was a case of not less than fifteen days' trial duration. Neither Rowe-Linn nor the husband presented sworn testimony at this proceeding. Rowe-Linn did not testify, nor did she estimate the amount of her expected fee, her hourly rate, or the amount of time required for the representation. The trial judge thus denied the husband's motion for temporary attorney's fees and stated his intent to conduct a hearing on the issue of entitlement at the end of the trial.
Prior to the closing arguments in this fifteen-day trial, the husband asked the judge whether he should prepare a proposed final judgment. The judge responded that he did not expect the husband to do so and that if the case was decided in the husband's favor, a staff of legal aides assigned to the family division would work with the judge to draft a final judgment. On the following day and prior to closing arguments, counsel for the wife submitted a proposed final judgment. After closing arguments, the judge asked the husband whether he had drafted a proposed final judgment. The husband stated that he had not but asked whether he could submit one later that day. Once again, the judge stated that it was unnecessary for the husband to do so and that the staff of legal *386 aides would draft a final judgment if the case was decided in the husband's favor.
The final judgment proposed by the wife's counsel was signed without modification by the trial judge within two hours of the closing arguments. The final judgment submitted was twenty-five pages in length, with six additional pages of financial exhibits incorporated by reference. The judgment awarded sole parental responsibility of Adam to the wife, finding that it would cause great detriment to Adam to do otherwise, and ordered the husband to have absolutely no contact with Adam until age fourteen.[2] However, the judgment permitted the husband to thereafter petition the court to allow him to have contact with Adam, provided the husband was able to show a substantial change of circumstances. Lastly, the judgment ordered the husband to pay reasonable fees and costs for the "vexatiousness of the litigation" as it pertained to the discovery process and provided that the amount of fees be determined in a later evidentiary hearing.
On appeal before the Fourth District, the husband unsuccessfully raised eleven issues, three of which he now presents to this Court: (1) the judge improperly delegated his decision-making authority to the wife's counsel by adopting the proposed final judgment verbatim within two hours after closing arguments; (2) the judge erred in failing to hold a hearing during the trial to determine the husband's entitlement to temporary attorney's fees, even if this required a continuance; and (3) the judge erred in denying the husband's motion to appoint a guardian ad litem arguing that if, as the Fifth District held in Cothron v. Hadley, 769 So.2d 1148 (Fla. 5th DCA 2000), it is reversible error not to appoint a guardian ad litem before changing a child's name, then it must be reversible error not to appoint a guardian ad litem before severing all ties between a child and his father.
With respect to the issue of improper delegation of the trial judge's role, the Fourth District held that, even though the judge wholly adopted the wife's proposed final judgment within two hours of the closing arguments, the final judgment should be affirmed. Perlow, 816 So.2d at 217. The Fourth District disagreed with the husband's argument that its holding conflicted with the Fifth District's holding in Rykiel. Id. To support its conclusion, the Fourth District referred to two subsequent Fifth District cases which, in its view, clarified the Rykiel holding: Douglas v. Douglas, 795 So.2d 99 (Fla. 5th DCA 2001), and Thomas v. Thomas, 781 So.2d 540 (Fla. 5th DCA 2001). In Douglas, the Fifth District stated that the trial judge in Rykiel had not been prepared and was not knowledgeable of the case before adopting the final judgment. Therefore, that judge's verbatim adoption of counsel's proposed final judgment in Rykiel constituted reversible error. See Douglas, 795 So.2d at 100 n. 1. In Thomas, the Fifth District also rejected the argument that Rykiel stood for the rule that a proposed final judgment adopted verbatim by a trial court is reversible error and concluded, in accord with its holding in Douglas, that reversal of the final judgment in Rykiel was due to that judge's lack of preparation and knowledge of the case. See Thomas, 781 So.2d at 540-41. In the instant case, the Fourth District concluded that the record contained evidence which supported the judge's findings of fact and dispositions made in the final judgment. Therefore, the Fourth District concluded, the judge's adoption of the proposed final judgment *387 was neither an abuse of discretion nor reversible error. Perlow, 816 So.2d at 217.
On the issue of entitlement to a hearing on temporary attorney's fees, the Fourth District held that the trial court did not abuse its discretion when it denied the husband's motion for a continuance nor when it denied the husband's motion for attorney's fees since the husband had procrastinated in seeking counsel. Id. at 215. Lastly, on the issue of appointment of a guardian ad litem, the Fourth District held that the husband's interpretation of Cothron was incorrect, disagreed with the husband's characterization of the final judgment as a termination of his parental rights,[3] and concluded that the trial court did not abuse its discretion when it denied the husband's motion for the appointment of a guardian ad litem because he had waited until the trial had commenced before making the motion. Id. at 216.

DISCUSSION
The husband argues that the trial judge improperly delegated his decision-making authority when he entered the wife's twenty-five-page proposed final judgment two hours after the trial concluded and made no changes to that proposed final judgment. The husband relies on Rykiel v. Rykiel, 795 So.2d 90 (Fla. 5th DCA 2000), quashed on other grounds, 838 So.2d 508 (Fla.2003), for the argument that such a procedure is reversible error. In Rykiel, the Fifth District reversed a final judgment of dissolution of marriage where the trial judge wholly adopted the former wife's counsel's proposed judgment, stating:
Although a trial court may request, as it did in this case, that counsel for both parties submit a proposed final judgment, the court may not adopt the judgment verbatim, blindly, or without making in-court findings. Review of the findings and conclusions of such a judgment is hampered or made impossible by the trial court's lack of participation. In this case, the record contains no findings or conclusions by the trial court, and the final judgment has no corrections, additions or deletions on its face. Under these circumstances, meaningful review by this court is impossible.
Id. at 92 (citations omitted).
In the instant case, the trial judge made no changes, additions, or deletions to the twenty-five-page final judgment proposed by the wife's counsel and signed this judgment within two hours after its submission. Perlow, 816 So.2d at 217. Moreover, the trial judge did not make any findings of fact or conclusions of law on the record. As a result, the husband asserts that Rykiel and the instant case are factually indistinguishable, and there is a conflict. The Fourth District stated that the husband is incorrect in this assertion. Id. The Fourth District stated that, while it might appear that there is a conflict between the two district courts, subsequent opinions issued by the Fifth District, namely Thomas and Douglas, have clarified the Rykiel holding so that this conflict is illusory. Id. We disagree with the Fourth District on this point.
While it is true that the courts in Douglas and Thomas sought to clarify the factual circumstances of Rykiel, it is clear that the facts relied upon in those subsequent decisions do not appear on the face of the Rykiel opinion and thus cannot be used in determining whether or not there is conflict. The Rykiel opinion on its face *388 indicates that a proposed final judgment submitted without any in-court findings by the trial judge and without any corrections, additions, or deletions cannot be meaningfully reviewed by an appellate court. On the other hand, the appellate court in this case, under similar circumstances, found that the case could be properly reviewed and affirmed the trial court's ruling, concluding that the findings in the proposed order were supported by competent, substantial evidence. We agree with the husband that this case conflicts with the Fifth District's decision in Rykiel.
In marital dissolution proceedings, it is quite common for the trial judge to request that both sides present a proposed final judgment at the conclusion of the case. See, e.g., Merkin v. Merkin, 804 So.2d 595, 598 (Fla. 2d DCA 2002) ("It is not uncommon for a trial court to instruct the attorneys to prepare proposed final judgments."); Flint v. Fortson, 744 So.2d 1217, 1219 (Fla. 4th DCA 1999) ("[W]e cannot foreclose the trial court's practice of requesting proposed final judgments from the parties. Such submissions can be useful to the trial judge in the decision making process.... By using the attorneys' submissions as a checklist, a judge can ensure that the final judgment is complete and avoid the necessity of motions for rehearing to correct omissions."). Additionally, the comment to Canon 3B(7) of the Florida Code of Judicial Conduct contemplates this type of procedure and provides:
A judge may request a party to submit proposed findings of fact and conclusions of law, so long as the other parties are apprised of the request and are given an opportunity to respond to the proposed findings and conclusions.
However, in the instant case, the trial judge did not request a proposed final judgment from the husband. Rather, at the conclusion of the evidence when the husband asked the trial judge whether he needed to prepare a proposed final judgment, the trial judge stated:
I sort of didn't expect you to have one. So what we do have on staff is legal aids that are assigned to the family division and they would havebasically if I decide in your favor, then I will be working with them to come up with a final judgment. But, if you have one to present, by all means present it.
On the following day at the conclusion of the closing arguments and after the wife's attorney had submitted a proposed final judgment, the trial judge asked the husband if he had prepared a proposed final judgment. When the husband responded that he had not prepared one but asked if he could submit one later that day, the trial judge responded:
That's okay. There are attorneys that will help me with it if I need them. There will be a decision ready, copies can be picked up from Judge Colton's judicial assistant, any time after 3:00 o'clock this afternoon.
Thus, the trial judge actively discouraged the husband from filing a proposed final judgment. However, the trial judge accepted and used the proposed final judgment submitted by the wife's attorney.[4]
The First District in Cole Taylor Bank v. Shannon, 772 So.2d 546 (Fla. 1st DCA 2000), addressed a situation where the trial *389 judge requested a proposed final judgment from only one party. In Shannon, the trial judge requested that only Shannon submit a proposed final judgment and subsequently adopted that judgment. Id. at 549. The First District approved the trial judge's actions, stating that reversal would be required only if the judgment (or a finding in the judgment) were inconsistent with an earlier pronouncement of the trial judge, if there were an appearance of impropriety, or if the record established that the final judgment did not reflect the trial judge's independent decision. Id. at 551. The First District went on to comment that Cole Taylor Bank had ample opportunity to object to Shannon's proposed final judgment or to submit its own proposed final judgment. Id. Unlike Cole Taylor Bank, the husband in this case was afforded no such opportunity.
In Hanson v. Hanson, 678 So.2d 522 (Fla. 5th DCA 1996), the Fifth District also addressed a situation where the trial judge received a proposed final judgment from only one party in a marital dissolution case. The Fifth District reversed the final judgment because the trial judge met with one party's counsel after closing arguments, never invited or notified the other party of the meeting, and spent an hour discussing the final judgment that counsel was to prepare. Id. at 523. In response to the trial judge's actions, the Fifth District quoted this Court's opinion in Scull v. State, 569 So.2d 1251, 1252 (Fla. 1990):
Here, the appearance of irregularity so permeates these proceedings as to justify suspicion of unfairness. This, we believe, is as much a violation of due process as actual bias would be. Accordingly, we must vacate the sentence and remand for another sentencing hearing in compliance with this opinion.
678 So.2d at 524.
While there is nothing in the record of this case to suggest that the trial judge met ex parte with the wife's counsel prior to submission of the proposed final judgment, the trial judge did not permit the husband an opportunity to submit his own proposed final judgment or to object to the wife's proposed final judgment. Furthermore, because the final judgment (twenty-five pages in length with six additional pages of financial exhibits incorporated by reference) was submitted by the wife's counsel and adopted verbatim without any additions, changes, or deletions so quickly thereafter (i.e., within two hours of its submission) without the trial judge having indicated on the record any findings of fact or conclusions of law, there was an appearance that the trial judge did not independently make factual findings and legal conclusions, i.e., an appearance of impropriety. In Ross v. Botha, 867 So.2d 567 (Fla. 4th DCA 2003), the Fourth District has since acknowledged that such an appearance of impropriety cannot stand. In Ross, the Fourth District offered the following admonitions: (1) a trial judge should never request a proposed final judgment from only one party without making certain that the other side has an opportunity to comment or object; and (2) the practice of a trial judge adopting verbatim a proposed final judgment without making any modifications, additions or deletions, and without making any comments on the record prior to entry of the final judgment is frowned upon. Ross, 867 So.2d at 571-72.
We understand and appreciate the fact that a trial judge in these often complex and multi-issue dissolution cases can benefit from proposed findings and conclusions prepared by the parties. Such proposals can serve as a starting point and reminder of the facts and issues that should be considered and weighed by the judge in his or her own evaluation. However, *390 such submissions cannot substitute for a thoughtful and independent analysis of the facts, issues, and law by the trial judge. When the trial judge accepts verbatim a proposed final judgment submitted by one party without an opportunity for comments or objections by the other party, there is an appearance that the trial judge did not exercise his or her independent judgment in the case.[5] This is especially true when the judge has made no findings or conclusions on the record that would form the basis for the party's proposed final judgment. This type of proceeding is fair to neither the parties involved in a particular case nor our judicial system.
Therefore, we agree with the conclusions reached by the First District in Shannon, the Fifth District in Hanson, and the Fourth District in Ross. While a trial judge may request a proposed final judgment from either or both parties, the opposing party must be given an opportunity to comment or object prior to entry of an order by the court. Moreover, the better practice would be for the trial judge to make some pronouncements on the record of his or her findings and conclusions in order to give guidance for preparation of the proposed final judgment.

CONCLUSION
Based on the foregoing, we conclude that the trial judge erred in this case by entering as the final judgment the proposed final judgment prepared by the wife's attorney without giving the husband an opportunity to comment or object. We, therefore, quash the Fourth District's decision in this case and remand to the trial court for a new trial.[6] Pending retrial, the trial court shall hold a hearing as soon as practicable regarding temporary custody and all temporary matters concerning the child. We approve the decision of the Fifth District in Rykiel to the extent that it is consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs with an opinion.
LEWIS, J., concurs specially with an opinion.
PARIENTE, J., concurring.
I fully concur in the majority opinion. I also concur with Justice Lewis in his conclusion that the trial court should have determined the husband's entitlement to attorneys' fees and should have appointed a guardian ad litem to represent the best interests of the child under the unique circumstances of this unfortunate case. I write to set forth my additional perspective on the challenges that we in the judicial system confront in family court matters.
We do not know whether a miscarriage of justice occurred in this case, but the appearance of unfairness is certainly present. Canon 3B(7) of the Code of Judicial Conduct was clearly violated when the trial court entered the wife's proposed final judgment without first giving the unrepresented husband an opportunity to either *391 respond or submit his own proposed final judgment.
Regarding the actions of the wife's attorney, I have concerns both with the manner in which the proposed final judgment was submitted and with the actual language of the proposed final judgment. First, the proposed final judgment that was submitted by the wife's attorney to the trial court should have been given to the husband before it was provided to the trial court, to afford the husband an opportunity to make objections. See American Academy of Matrimonial Lawyers [AAML], Goals for Family Lawyers § 7.12 (2000) [hereinafter Goals for Family Lawyers] ("An attorney should submit proposed orders promptly to other counsel before submitting them to the court."). This aspirational standard is equally, if not more, important when the litigant is unrepresented and may be less knowledgeable about the legal process.
Second, the entire twenty-five-page final judgment is replete with inflammatory and one-sided findings and conclusions. Some examples are:
[T]he Husband's conduct to the Wife can only be described as atrocious. ...
....
The incidences involving the Husband are so numerous ... that it would again take pages for this Court to write each and every incident and how the Husband has involved this child. Thus, the Court will take the most prominent of the incidences, so to express to the reader how horrible the Husband's behavior has been with the parties' child ....
....
However, on the other hand, the Wife... is probably one of the most exemplary persons that the Court has seen in a very long time. ...
....
... [T]he Husband ... shall have absolutely no contact with the parties' child until the child reaches age 14.... [T]he Court will specifically reserve jurisdiction as to this issue as the Husband will probably find a way somehow to circumvent this order ....
....
The Court finds that the order of the Court in which the Wife should not disparage the Husband to the child is now becoming a detriment to the child.... [T]he Wife should advise the child of this Court's specific findings and why this Court has done what it has done, including but not limited to the Husband's extensive background involving his deceitfulness, his lack of remorse, his arrests, his poor behavior control and impulsivity, his lack of empathy, and his total anti-social personality disorder.

(Emphasis supplied.)
I regard this type of language as unacceptable and inexcusable, especially when it involves a child, who may one day read the final judgment. Indeed, AAML standards 6.1 and 6.2 evidence a clear disapproval of attorney conduct that increases the adverse impact of the divorce on a child or encourages a parent to use access to a child for leverage or vindictiveness. See Goals for Family Lawyers § 6.1 ("An attorney representing a parent should consider the welfare of, and seek to minimize the adverse impact of the divorce on, the minor child."); id. § 6.2 ("An attorney should not permit a client to contest child custody, contact or access for either financial leverage or vindictiveness.").
In addition, submission of proposed final judgments by the parties can be of assistance to trial judges only if the proposed judgments set forth the facts in an objective and neutral manner. Instead, this proposed final judgment is more like a *392 diatribe filled with exaggeration and venom. Advocacy of this sort is unprofessional, does little to assist the trial court in its decisionmaking, and is especially destructive when children are involved. See The Florida Bar, Ideals and Goals of Professionalism Goal 7.3 (1990) ("A lawyer should not permit the client's ill will toward an adversary ... to become that of the lawyer's."); Goals for Family Lawyers § 1.3 ("An attorney should refuse to assist in vindictive conduct and should strive to lower the emotional level of a family dispute by treating all other participants with respect.").
From a review of the entire proceedings in this case, it appears that however "exemplary" the wife may be as a human being, the effect of the wife's conduct, through her attorney, was to use the child to punish the husband. This case should serve as a reminder of the legislative purposes of chapter 61, which are:
(a) To preserve the integrity of marriage and safeguard meaningful family relationships;
(b) To promote the amicable settlement of disputes that arise between parties to a marriage; and
(c) To mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage.
§ 61.001(2), Fla. Stat. (2003) (emphasis supplied). It is not just judges who are responsible for enforcing this legislative mandate, but also the attorneys who represent the litigants.
This case also serves as a reminder of the importance of the guiding principles for a unified family court that we espoused in our recent unanimous opinion:
[O]ur goal continues to be the creation of "a fully integrated, comprehensive approach to handling all cases involving children and families," while at the same time resolving family disputes in a fair, timely, efficient, and cost-effective manner. We also stress the importance of embracing methods of resolving disputes that do not cause additional emotional harm to the children and families who are required to interact with the judicial system.
In re Report of the Family Court Steering Committee, 794 So.2d 518, 519-20 (Fla. 2001) (citation omitted).
What happened in this case was both inexcusable and preventable, not only regarding the final judgment but also in events preceding the trial. I thus agree with Justice Lewis that there was no reason for the trial court to deny the husband the opportunity to establish entitlement to attorneys' fees.[7] I also agree with Justice Lewis that under the circumstances of this case, the trial court should have appointed a guardian ad litem to look out for the child's best interests.
Further, I comment on the fact that this case involved an unrepresented litigant. Although both litigants in this case were represented by attorneys at the outset of the litigation, by the time of trial, only the wife retained counsel. The scenario of one or both litigants being unrepresented is unfortunately both a statewide and nationwide trend. As we recently reiterated in our opinion adopting rules relating to unbundled legal services, "[a]pproximately *393 65% of initial filings in domestic relations cases involve self-represented litigants and 80% of post-judgment proceedings in domestic relations cases involve at least one unrepresented litigant." See Amendments to the Rules Regulating Fla. Bar & Fla. Family Law Rules of Procedure (Unbundled Legal Services), 860 So.2d 394, 395 (Fla.2003) (hereafter "Unbundled Legal Services") (quoting In re Report of the Family Court Steering Committee, 794 So.2d 518, 527 (Fla.2001)). In fact, the primary impetus for our adoption of a rule regarding limited in-court representation in family law matters was the recognition of the reality that an overwhelming majority of litigants in these matters are unrepresented.
We have attempted to deal with the challenges of unrepresented litigants over the years by adopting self-help forms, by continuous updating of those family law forms through our web site, and most recently by adopting our unbundled legal services rule. In that opinion we stated:
Through the years, in keeping with the general mission of the judicial branch, this Court has strived to implement changes that improve access to justice for all of our citizens.... We have continued to seek new ways to facilitate access to justice for moderate- to low-income Floridians.
In 1998, this Court adopted a rule governing self-help services and court-approved forms in the family law arena.... We have since reiterated that our goal remains to "provide families and children with an accessible and coordinated means of resolving legal matters in a fair, efficient, and effective manner." In re Report of Family Court Steering Committee, 794 So.2d at 523. Thus, we have not only encouraged access, but have been guided by the principle that access to justice must be meaningful by being fair, efficient, and effective. As a former president of the American Bar Association has observed, "the failure of our justice system to provide meaningful access falls hardest on those least able to afford a lack of access." Robert Hirshon, Providing All Americans with a Key to the Courthouse, Judges' J. 5 Winter 2001 at 5,5.
Unbundled Legal Services, 860 So.2d at 397-98. Although the facts and the amount of assets in this case are not typical of cases involving unrepresented litigants, who generally have limited resources,[8] the additional challenges that are faced by both the trial court and opposing counsel when only one side is unrepresented are universal.
Lastly, I comment on the subject of judicial discretion, which Justice Lewis discusses in his specially concurring opinion. In our decision in Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), the Court explained the following important principles of utilizing discretion:
The discretionary power that is exercised by a trial judge is not, however, without limitation, and both appellate and trial judges should recognize the concern which arises from substantial disparities in domestic judgments resulting from basically similar factual circumstances.... The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial courts' discretionary power was never intended to be exercised in accordance *394 with whim or caprice of the judge nor in an inconsistent manner. Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic nor reasonableness.

Id. at 1203 (emphasis supplied). However, as I lamented in Farrior v. Farrior, 736 So.2d 1177 (Fla.1999),
[n]ineteen years after Canakaris, I question whether, as a result of Canakaris, trial and appellate decisions provide any more predictability to litigants or to their attorneys when advising clients on probable outcomes. Flexibility in the name of discretion has often led to uncertain outcomes-both of which may be "reasonable." This is not meant as a criticism of any individual judge. Rather, it is a comment on the difficulty, but yet the importance, of predictability for the litigants embroiled in a family law controversy.
Id. at 1179 (Pariente, J., concurring).
Regardless of the issues surrounding the appropriate use of the abuse of discretion standard, our family court system will never fulfill its fundamental mission until all stakeholders and all attorneys that represent parents and children recognize that our responsibility is to promote the resolution of conflict rather than create conflict, and that children's best interests are not furthered by escalating litigation. This is especially so when the children are used by the parents to punish each other:
[I]f family law attorneys are adversarial and attempt to win custody, the anger and distrust between former spouses are especially likely to be exacerbated and often endure unabated for years after the final decree. This result is a grave problem for children who consequently experience far more stress, unhappiness, and insecurity in homes with interparental hostility.
Edward Teyber, Helping Children Cope with Divorce 82 (1992).
Although a lawyer may represent a husband or a wife, the parties must be actively discouraged from perceiving the issue of custody as a win or lose proposition, and from treating the child as just another part of the marital property to "win or lose," or to "divide." In adopting the principles of our unified family court, this Court envisioned a system that works to settle familial disputes as amicably as possible:
By identifying and providing families access to appropriate court and community services and by offering a variety of dispute resolution forums where families can resolve conflict without exacerbating emotional trauma, the judicial system will promote the resolution of conflict and not facilitate conflict. If the judicial system encourages alternatives to the adversarial process, empowers litigants to reach their own solutions, and assists in crafting solutions that promote long-term stability in matters involving children and families, the likelihood of future court intervention in the family should be decreased-whether this be through minimizing post-judgment litigation or preventing the dependent child of today from becoming the delinquent child of tomorrow.
In re Report of the Family Court Steering Committee, 794 So.2d at 535-36.
For this vision to be realized, lawyers, judges, and all of our stakeholders must act cooperatively with a common goal of truly acting in the best interests of the child and promoting the resolution of conflict for the children and families that come in contact with our courts of justice. This is not a matter of discretion; it is a matter of necessity for the children who otherwise become the unintended victims of the conflict *395 between the parents both in and out of the courthouse.
LEWIS, J., specially concurring.
While I fully concur with the majority's determination to quash the district court decision affirming the final judgment entered by the trial court, I write separately to underscore the magnitude of the errors in this proceeding which culminated in the trial court simply adopting in full, and without modification, the final judgment submitted by respondent's counsela document authored by very experienced and sophisticated counsel without opposition that is so filled with accusation and advocacy that it does not appear to be the proper and expected product of thoughtful deliberation by a neutral arbiter of the law. The transcript here reflects the absolute disaster which can occur when a party proceeds without counsel. Moreover, I am compelled to address two other errors of law presented on appeal to the district court that the majority opinion deems unnecessary to address or resolve.
First, with respect to the issue of the petitioner's entitlement to attorneys' fees, the trial court, in my view, made two errors of law. Initially, the trial court erred by requiring the petitioner to first secure the representation of counsel in the dissolution action prior to even considering the entitlement to temporary fees. One may rhetorically inquire as to how one is expected to retain counsel when no funds may be available to pay the retainer fee. Subsequently, when the party made arrangements for counsel to appear to address the matter of fees, the trial court then inexplicably and improperly refused to render a determination regarding the petitioner's entitlement to temporary attorneys' fees until after the trial was completed, leaving the petitioner to represent himself over the course of a lengthy and complex domestic proceeding which included substantial issues related to a child and, primarily, sophisticated expert testimony predicated upon hypothetical questions.
Secondly, and even more disturbingly, the final judgment entered by the trial court here effectively terminated the petitioner's parental rights with regard to the couple's minor child. This draconian relief was produced without the benefit of equal independent experts, without taking any measures to ascertain and protect the individual rights of the minor child as repetitively requested during the proceedings, and without the petitioner having counsel.
Of equal concern, as grave as the errors of the trial court may have been, is the district court's failure in the review process of the instant case to correct the errors which have led to this day. Despite the improprieties of the lower proceedings, the district court simply determined that the petitioner had failed to demonstrate reversible error or an abuse of discretion. It is my view that the district court's reflexive reliance on the mantra of trial court discretion is completely inappropriate in the instant action.
One must expect that very experienced and sophisticated counsel without opposing counsel would certainly present evidence, whether properly admissible or not, in support of the relief requested. The matters presented by the petitioner on appeal did not implicate issues controlled by the personal discretion of the trial court. See Canakaris v. Canakaris, 382 So.2d 1197, 1202 (Fla.1980). To the contrary, the trial court's actions contravened established principles of law, which have no nexus with the historic justification for the abuse of discretion standardnamely, the trial court's superior ability to observe the participants and events of trial. See id. Therefore, I sound the caution bell against a review system in which unjustified *396 adherence to the notion of judicial discretion renders each courtroom in the state the law unto itself. Make no mistake, there is certainly the need for judicial discretion in the crafting of relief in matrimonial matters. However, when all becomes discretionary, parties know not what to expect or predict, attorneys are unable to advise clients as to the certainty of parameters for consideration, and those coming in contact with the judicial system at a time when emotions are on edge and tremendously heightened (and this includes an ever-increasing number of Florida citizens) walk away questioning the very system and process utilized to resolve these disputes.
I concur with the majority's determination that the trial court improperly delegated its decision-making authority here to the respondent by adopting her proposed final judgment without modification, or even, apparently, an opportunity for thoughtful reflection. In both substance and form, the final judgment facially is doubtlessly the work of an experienced, zealous, partisan advocate, as opposed to an informed, but neutral, officer of the judicial system. The trial court's action in merely adopting the petitioner's final judgment as it exists in this case contravenes established principles of law requiring the judgenot the partiesto decide the issues in the case.
Importantly, the only counsel participating did not merely submit a skeleton or broad brush order into which the trial judge could insert his own findings of fact and conclusions of law. Nor did counsel simply reduce to writing the oral findings issued by the trial judge from the bench. Trial counsel did not prepare a document requested by the court, nor was it in a form acceptable for proper judicial analysis. Instead, without any guidance from the trial court regarding its determination or the factual basis underlying any element thereof, counsel for the respondent submitted a proposed final judgment consisting of twenty-five pages of numerous, detailed "findings of fact" regarding, among other items, the petitioner's alleged psychopathic personality, and the negative impact his conduct has had on the child and the child's relationship with the respondent. It is most interesting to note that as early as March 13, several days before all of the evidence had even been presented, the trial court announced that he would enter judgment rapidly when he stated, "I said that I would get an order out on this case very quickly." However, within two hours of the close of trial, the trial judge had affixed his signature to the final judgment. It is difficult to understand how a judge would have been able to comprehensively digest this substantial document in that time, let alone adequately reflect on whether the document fully and accurately captured his judgment with regard to the complex and substantial issues presented in the instant action, which included a most serious provision tantamount to a termination of parental rights.
Not only do the circumstances of the submission and approval of the final judgment present issues as to whether it was the product of the trial judge's own adequate, independent deliberation, the impact and outer extremes to which the final judgment flows are remarkable. The judgment not only awarded sole parental responsibility for the child to his mother, but proceeded to order that the father have absolutely no contact with the child whatsoever until he reaches the age of fourteen, despite the fact that the mother initially sought only primary custody of the child, with shared parental responsibility and liberal visitation by the father. See Perlow, 816 So.2d at 212, 214. The complete abolition of contact between the petitioner and his son required by the final *397 judgment here even exceeds that which is ordered in many termination of parental rights proceedings where some accommodation can be made for continued contact between the parent and child. Here, by contrast, the petitioner is foreclosed from having any direct or indirect contact with his son, and is not even permitted to send his love to his son by way of a third party.
The opportunity for modification of the custody award upon the child's reaching the age of fourteen fails to mitigate the severity of the final judgment and overlooks the nature and extent of the mental health matters asserted and argued by the very experienced counsel. Importantly, the final judgment requires the petitioner to show a substantial change in circumstances in the best interest of the child to attain a modification of the custodial arrangement. At the same time, the order specifically encourages the respondent to communicate the trial court's adverse findings of fact and judgment to the child, including information regarding the petitioner's alleged deceitfulness, lack of remorse for his actions, arrests, and antisocial personality disorder. See Final Judgment of Dissolution of Marriage at 21-22. Thus, the order mandates and creates a void in the relationship between the father and son which the mother is free to fill with material designed to destroy any basis for contact with the father in the future. Given the position that mental health experts hired by the wife have already expressed in rendering the custody-related decision, future modification of the custody arrangement entered by the trial court below is highly unlikely and probably illusory with this anti-father indoctrination. It is also most interesting that the order prepared by the wife's counsel reflects, along with the notes of initial visits with mental health experts, the party responsible for attempted "alienation" if such concept even has any application in this controversy. It is most shocking that a party would argue reverse "alienation" for her benefit to terminate the father's rights and then proceed to submit a judgment that specifically mandated that the child be indoctrinated with hate and awfulness related to the father. It appears that "alienation" must be a concept in the eyes of the beholder. "Alienation" jumps from the pages of the document submitted on behalf of the wife and must be considered in any further proceedings if any party continues to assert the concept of "alienation" as a basis to impact any parent-child relationship. The record is replete with evidence that the behavior of the child torn by this process and this proceeding was exacerbated by the efforts to limit and foreclose his contact with his father.
Any doubt regarding judicial involvement in crafting the final judgment disappears upon a cursory examination of the language used to convey the substance of the order. The advocacy simply courses through the entire document. The following excerpt from the "findings of fact" characterizing the nature of the parties' relationship demonstrates the deeply personal and one-sided nature of the final judgment:
[T]he Husband's conduct to the Wife can only be described as atrocious. ... The Husband belittled her, tormented her, ridiculed her, disrespected her, [and] disparaged her....

The sad part of the Husband's conduct was not only did the Wife attempt to try harder to please the Husband (even going to the grocery store on a daily basis to buy fresh foods for the Husband as he only desired the same), but this attempt was rewarded by him throwing the meal at her. She has continued to try (almost to the date of the trial), to be a good wife to him even *398 though the Husband's conduct continues to occur as stated.
Id. at 5 (emphasis supplied). In justifying the severance of the petitioner's parental rights, the final judgment states:
The incidences involving the Husband are so numerous ... that it would again take pages for this Court to write each and every incident and how the Husband has involved this child. Thus, the Court will take the most prominent of the incidences, so as to express to the reader how horrible the Husband's behavior has been with the parties' child and why the Court is entering this final judgment herein.

Id. at 8 (emphasis supplied). The extremely partisan nature of this paragraph comes into stark relief when one realizes that it prefaces a list of eight incidents, two of which amount to nothing more than the petitioner being late in bringing the couple's minor child to holiday celebrations. The father's "horrible" parenting sharply contrasts with the assessment of the mother's skills. On that score, the final judgment states, "However, on the other hand, the Wife has attempted to set limits on the child and is probably one of the most exemplary persons that the Court has seen in a very long time." Id. at 10 (emphasis supplied). The inclusion of this self-serving statement is as remarkable as it is troubling, especially when one considers that the final judgment prohibits all direct and indirect contact between the petitioner and his son. No doubt, the wife is a wonderful and exemplary person but the process became misdirected by those around her.
When a parent without counsel is totally denied contact with his or her child, when the pleadings have so drastically wavered, and the total prohibition flows from a judgment prepared by an opposing attorney which is in the form before us, a fundamental issue is presented. In Rykiel v. Rykiel, 795 So.2d 90 (Fla. 5th DCA 2001), quashed on other grounds, 838 So.2d 508 (Fla.2003), the Fifth District announced a specific, clear point of law applicable in marriage dissolution proceedings: "Although a trial court may request ... for both parties [to] submit a proposed final judgment, the court may not adopt the judgment verbatim, blindly, or without making in-court findings." Id. at 92. Again, in White v. White, 686 So.2d 762 (Fla. 5th DCA 1997), the Fifth District exhorted:
It is the court's unique responsibility to make the decisions on the various issues of the case based on the pleadings before it and its view of the evidence presented. The court does not fulfill this responsibility by merely choosing the better proposed judgment or the better option contained in competing proposed judgments presented by the attorneys. Often the attorneys, without appropriate guiding instructions, will make findings of fact and even rulings of law that the court, without such prompting, would never have considered.
Id. at 763.
It is clear that an even more problematic scenario than that outlined in Rykiel and White has arisen in the instant matter. Here, the trial court made no oral findings of fact or otherwise provided any record guidance to counsel regarding the contours of its decision. The situation is even more egregious because the trial judge actively discouraged the unrepresented petitioner from submitting his own final judgment, only to accept and execute, in such a short period of time, a lengthy document filled with partisan rhetoric that resulted in such an extreme outcome.
In my view, it is impossible to draw any conclusion or inference other than this "final judgment does not `reflect the trial *399 judge's independent decision on the issues of [the] case.'" Cole Taylor Bank v. Shannon, 772 So.2d 546, 551 (Fla. 1st DCA 2000) (quoting Flint v. Fortson, 744 So.2d 1217, 1220 (Fla. 4th DCA 1999)). Indeed, despite the district court's assurance that each of the trial court's "findings" is supported by competent, substantial evidence (albeit without proper adversarial testing due to the lack of opposing counsel), I believe that the trial judge's adoption of the final judgment at issue here creates the "appearance of impropriety [that] so permeated the proceeding below as to justify a suspicion of unfairness." Id. (quoting Hanson v. Hanson, 678 So.2d 522, 525 (Fla. 5th DCA 1996)).
The erosion of public confidence in the judiciary that results from actions such as those involved here is especially crippling in the context of domestic relations. Most Floridians who come into contact with the judiciary do so in this highly emotional and tumultuous arena touching upon issues dissolving relationships of families and children. For that reason, domestic relations cases are entitled to receive, and we must expect absolutely, a detached, unbiased, logical, and supportable decision-making process. Here, a party admittedly expended approximately $850,000 in proceedings that were ultimately directed almost exclusively to terminating an opposing parent's parental rights. This economic power produced a professional engine driven primarily by opinions based on hypothetical facts without a counterbalancing force of legal representation to provide a basis for a proper and adequate testing of the matters and opinions presented. Indeed, the transcript is replete with hearsay, solicitation of questionable opinions and conclusory testimony from witnesses including a gas station attendant, and monumental hypothetical questioning, questionable at best, driven to the critical case issue.
I next turn to an issue not addressed by the majority related to the erroneous actions of the trial court with respect to the petitioner's entitlement to temporary attorneys' fees, especially when considered in the context of that which transpired in this case, most notably the final judgment entered here whereby petitioner was completely removed from his son's life. I must voice my concerns because this problem created the circumstances for other errors to occur.[9] In the instant case, the trial court was twice presented with the opportunity to address the issue of petitioner's entitlement to temporary attorneys' fees, once as a result of petitioner's pre-hearing motion, and then again when the petitioner presented the issue during the dissolution hearing. In each instance, the trial court's actions in addressing the issue constituted an error as a matter of law. I speak not of the merits of the issue of actual entitlement to fees, but to the issue of a party's right to have the issue of entitlement decided to permit a party to make informed decisions in the litigation.
In the first instance, on the petitioner's pre-hearing motion for temporary attorneys' fees, the trial court effectively ruled that the court would not even consider the issue of entitlement to temporary attorneys' fees unless the petitioner would first retain counsel to represent him, who could only then proffer to the court what his or her fees would be. Second, on the first *400 day of the dissolution hearing, the court again refused to rule on the issue of petitioner's entitlement to attorneys' fees until he actually retained an attorney. Then, on the second day of the dissolution hearing, after the petitioner had made arrangements for a local attorney to appear as the court had previously required, the judge stated that he would withhold ruling on the issue until the conclusion of the trial. The attorney who ultimately appeared for a hearing was willing to represent the petitioner if temporary fees were available, without condition as to amount, but counsel was not willing to provide totally free services if temporary fees were to be denied. The trial court refused to rule and the husband was not permitted to speak to the issue.
Mandating that a party in a dissolution action first retain counsel before determining if the party is entitled to temporary attorneys' fees, and then subsequently refusing to rule on the issue after the party has abided by that mandate, constitute errors of law, and were not rulings within the trial court's discretion, as held by the Fourth District. See Perlow, 816 So.2d at 214-15. While the determination of entitlement to a particular amount of fees was within the trial court's discretion, see Musselwhite v. Charboneau, 840 So.2d 1158, 1160 (Fla. 5th DCA 2003), the act of considering the request and making the initial entitlement decision, whatever that decision may have been, was not, in my view, discretionary. Even if a discretionary standard were applicable, the failure to consider the request and enter some ruling thereon, which effectively removed the opportunity to obtain counsel, was a palpable abuse of discretion. Interestingly, less than three months after the final judgment was entered, the petitioner's motion for temporary fees to cover the costs of the appeal was granted. Specifically, the court found that the petitioner had demonstrated need and the respondent's ability to pay, and ordered the respondent to pay temporary fees in the amount of $100,000. The order granting temporary fees for the appeal does not reflect any change in the petitioner's financial circumstances in the three months between the time of the final dissolution hearing and the grant of temporary fees for the appeal, suggesting temporary fees would have been warranted during the dissolution hearing, just as they were for the appeal. This absence of counsel could have been rectified and the resulting damage avoided if a proper determination had been timely entered.
As the district court noted, the trial court held a hearing on December 19, 1999, to address petitioner's original motion for temporary attorneys' fees. See Perlow, 816 So.2d at 212. Following the hearing, the trial court issued an order denying the motion. The order reflects that the petitioner, acting pro se during the hearing, attempted to show need and the opposing party's ability to pay to establish his entitlement to temporary attorneys' fees. Further, petitioner presented the testimony of one of his former attorneys, who testified regarding the fees that would be necessary to properly represent petitioner in the dissolution action. The trial court recognized that the award of temporary fees was authorized by section 61.16(1) of the Florida Statutes, but ultimately denied, without prejudice, petitioner's request for fees.
The decision of the trial court was unquestionably based on the fact that the petitioner had not actually obtained representation. In denying the fees, it was the position of the trial court that the petitioner had not satisfied his burden because he had not shown an actual obligation to pay attorneys' fees, or that the absence of an anticipatory award had prevented him from obtaining counsel. Further, the *401 court noted that it did not have sufficient evidence to determine the reasonableness of a fee to be awarded because, as the court wrote, "[t]here was no evidence as to the hourly rate that will be charged by the attorney who will represent the Husband, only general testimony as to hourly rates that are charged in the community." The court ruled that petitioner could again request fees after he retained counsel. Apparently, the testimony provided by petitioner's former attorney regarding the expected cost of the litigation was insufficient for the trial court; the court clearly was requiring that petitioner first retain counsel who had already agreed to represent him before an award of temporary fees would be considered.
The ruling of the trial court requiring the petitioner to first secure counsel prior to awarding fees constituted a legal error, and was not a matter within the court's discretion. It is undisputed that the trial court was authorized to award temporary attorneys' fees pursuant to section 61.16 of the Florida Statutes. Section 61.16 provides, in relevant part:
(1) The court may from time to time, after considering the financial resources of both parties, order a party to pay a reasonable amount for attorney's fees, suit money, and the cost to the other party of maintaining or defending any proceeding under this chapter, including enforcement and modification proceedings and appeals. In those cases in which an action is brought for enforcement and the court finds that the noncompliant party is without justification in the refusal to follow a court order, the court may not award attorney's fees, suit money, and costs to the noncompliant party. An application for attorney's fees, suit money, or costs, whether temporary or otherwise, shall not require corroborating expert testimony in order to support an award under this chapter. The trial court shall have continuing jurisdiction to make temporary attorney's fees and costs awards reasonably necessary to prosecute or defend an appeal on the same basis and criteria as though the matter were pending before it at the trial level. In all cases, the court may order that the amount be paid directly to the attorney, who may enforce the order in that attorney's name.
§ 61.16(1), Fla. Stat. (1999). "The purpose of this section is to ensure that both parties will have a similar ability to obtain competent legal counsel." Rosen v. Rosen, 696 So.2d 697, 699 (Fla.1997). To establish if one party is entitled to temporary attorneys' fees, the trial court must determine the party's need for fees and the opposing party's ability to pay. See id. Clearly, the statute does not require that the party seeking fees must first retain counsel as a condition precedent before an entitlement to fees can be determined. In fact, the language of the statute suggests otherwise. The statute provides that "[a]n application for attorney's fees, suit money, or costs, whether temporary or otherwise, shall not require corroborating expert testimony in order to support an award under this chapter." § 61.16(1), Fla. Stat. (1999). Clearly, the Legislature intended for a party to be able to obtain a determination as to whether a party is entitled to fees or costs without first retaining an attorney. Further, the statute provides that "[i]n all cases, the court may order that the amount be paid directly to the attorney," id. (emphasis supplied), suggesting that the court may order the fees awarded directly to counsel, but it certainly does not require that a party without funds somehow pay a retainer to hire counsel before the issue of entitlement is considered.
In Nichols v. Nichols, 519 So.2d 620 (Fla.1988), this Court held that a spouse *402 requesting fees does not necessarily refute his or her need for attorneys' fees by appearing at a hearing with a lawyer. See id. at 621. Such a rationale, this Court noted, would require the requesting spouse to appear pro se to be entitled to temporary attorneys' fees. See id. There, we reasoned that: "Under section 61.16, it is irrelevant that the legal fees in question are temporary or final or that a spouse appears at a hearing with counsel." Id. at 622. Logically, if a party cannot be denied temporary attorneys' fees based solely on the fact he or she has already secured an attorney, the converse must likewise be truea party cannot be denied at least a determination, favorable or unfavorable, on the issue of entitlement to temporary fees based solely on the fact that he or she is unable to find counsel willing to provide representation to that party with no provision for compensation.
The rule established by the trial court places a party in a proverbial "catch 22" by mandating that a litigant "hire" an attorneywithout being able to provide that the attorney will be compensated for his or her workto prove to the court that he or she needs funds to employ that specific attorney. Such a rule is not legally sound, and it should not be within the discretion of the trial court to require a party to retain counsel before the court will even entertain a determination of the party's entitlement to fees. Any citizen who is a party to a dissolution action has the right, granted by the Legislature pursuant to section 61.16, to request temporary attorneys' fees and costs. By requesting fees, a party is asserting that he or she does not have the ability to secure counsel. A person who asserts that he or she cannot afford counsel cannot be expected to employ counsel as a condition precedent to be eligible to request funds to pay the necessary fees and costs. It should be completely irrelevant, as it was in Nichols, whether the party is able to secure counsel prior to a ruling on entitlement. Instead, the judge should be able to rule on a party's entitlement to temporary attorneys' fees and costs at the time the request is presented, based upon the party's need and the opposing party's ability to pay, and then, when necessary and appropriate, subsequently determine the amount to be paid once the party, whom the court has ruled is entitled to fees, secures representation. A party may certainly have counsel when the request is presented, but the issue of entitlement can be resolved without actual retention when proper evidence is submitted as occurred here.
Having been denied a determination on temporary fees on his initial motion, petitioner again made a plea for funds on the first day of the dissolution hearing. On the morning of the first day, petitioner moved for a continuance, based in part on his lack of representation. The petitioner may not be without fault for failing to present the request earlier if a hearing time could have been secured. The court and the petitioner engaged in a lengthy dialogue concerning petitioner's history of representation in the instant action, his financial situation, his inability to hire experts due to his lack of funds, and his attempts to find an attorney to represent him. Clearly, although petitioner, who was appearing pro se, had moved for a continuance, the trial court was investigating whether the petitioner was entitled to temporary fees. The court even acknowledged that the purpose of the continuance would be to allow sufficient time for the petitioner to obtain the fees, assuming they were granted, and then hire an attorney. At the conclusion of the discussion, without explanation, and most importantly, without ruling on petitioner's entitlement to temporary attorneys' fees, the trial court denied the motion for a continuance.[10] *403 This issue of the continuance was certainly within the court's discretion and tardy action seeking fees may not justify a continuance. However, on the afternoon of the first day of the final dissolution hearing, petitioner again made a formal request for temporary attorneys' fees. In response, the trial court again stated:
The only way I know of basically doing attorney's fees is you have to get someone to come in here, an attorney to come in and say they have agreed to take the case on the basisand we have a hearing. There is no procedure whereby I order them to give you money to run out and hire an attorney.
Clearly, the court was again improperly mandating that the petitioner must first hire an attorney to represent him before the judge would rule on his request as to entitlement to temporary attorneys' fees. The court then informed the petitioner that if he brought an attorney with him to court the following day, the court would consider his motion for temporary fees.
On the morning of the second day of the dissolution hearing, petitioner informed the court that by that afternoon he would have an attorney present who would represent to the court what fees would be required to secure effective counsel in the dissolution action. The trial court then informed petitioner that even if he did appear with an attorney, the court would reserve jurisdiction and wait until the end of the case to determine petitioner's entitlement to fees. That afternoon, the petitioner appeared with an attorney. Before hearing any testimony regarding a fee structure for representation, the court made the following statement:
I want just to basically indicate the Court's position here, and that is that Mr. Perlow has indicated that he does not have sufficient funds to retain an attorney to represent him in this proceeding and I told him that he would have to get an attorney to come on board to say they would be willing to handle the case for him.
We've already begun the trial and he has absented himself. He has been in and out, actually.
I indicated to him that as a cursory observation of the financial affidavits that it appeared somewhat likely that I am going to reserve jurisdiction for fees, *404 that he might be entitled to fees and costs when the case was over with.
That's essentially all I can tell you at this point. It's a question of whether you want to come on board with that with knowing that or not. I can't delay the trial or continue it at this point.
In response, the lawyer appearing with petitioner at that time explained that she had been afforded little time to consult with petitioner and knew very little about the case. The court then explained:
What I am going to do at this point, I am inclined to recess this case and then basically give you the opportunity to meet with him for whatever time is left today and then make a decision as to whether or notand you can let me know tomorrow.
The lawyer responded:
I am prepared to let you know now. This is what I was going to tell Your Honor. If this is an instance where the only funding of the litigation is going to occur after the entry of a final judgment on a reservation of fees, after a finding of entitlement, after a finding of need on the part of the husband, a finding of ability to pay on the part of the wife, subject to appellate review, with the potential for a motion to stay; that even if the Court were to make all those findings in favor of Mr. Perlow, that is not a case that I would undertake, nor do I know of any other practitioner in Palm Beach County who would come on board under those circumstances, when it has been represented to me that this is a case of not less than 15 days trial duration.
The judge then stated that he was not going to continue with the issue, and thanked the lawyer for appearing. He added that the dissolution hearing would proceed immediately. Petitioner then clarified with the court that his motion for temporary fees was being denied. The judge stated:
I said I would hold a hearing at the end of the trial on the issue of entitlement. And, as I indicated, that preliminarily, just looking at the affidavits, preliminary it would appear likely that you would get entitlement. But I can't do that at this time.
The district court held that the trial court did not abuse its discretion by failing to grant a continuance or in denying petitioner's motion for attorneys' fees. See Perlow, 816 So.2d at 215. The district court below noted that on the afternoon of the second day of the dissolution hearing, when petitioner attended the hearing with an attorney, petitioner did not testify, nor did he request an opportunity to proffer evidence of his inability to pay for representation. See id. The district court's holding as to a continuance was correct, but the determination that it was within the trial court's discretion to refuse to rule on petitioner's entitlement to attorneys' fees, was, in my view, erroneous. As a matter of law, the trial court should be required to rule on entitlement to temporary fees under the circumstances presented here. Further, the transcript reflects that the petitioner was not even permitted to speak on the issue at that time.
When a citizen of this state is involved in a dissolution action, that citizen has the right, provided by section 61.16 of the Florida Statutes, to request temporary fees. It should not be within the discretion of the trial court to refuse to even consider the request, which is effectively what occurred in the instant action. Petitioner initially requested fees without having hired counsel, requested fees on the first day of the dissolution hearing, then adhered to the trial court's improper mandate that he secure an attorney who would *405 appear on his behalf, and despite the fact that the trial judge informed petitioner that he would likely grant fees at the end of the hearing, the court refused to rule on the issue of petitioner's entitlement to fees at the time when the ruling was most necessaryat the beginning of the hearing when petitioner would be able to use that determination to secure representation. Instead, as a result of the trial court's refusal to rule on entitlement, petitioner was forced to proceed pro se, to defend himself against a party clearly in a much stronger position financially, and as a result, petitioner was extremely prejudiced and experienced a severely adverse judgment which included not only the termination of his parental rights, but, even further, the total loss of any access to or contact with his child in any manner. The trial court wrote, "the Husband ... shall have absolutely no contact with the parties' child until the child reaches age 14," and explained that no contact included no telephone or e-mail communications, no videos, no school visitation or access to the child's school records (despite the fact that the father was ordered to pay for the child's private school education), and no contact indirectly by third parties, including relatives, on behalf of the father.
The suggestion by the district court that petitioner himself is to blame for the court's ruling because he failed to testify or to proffer evidence, does not, in my view, adequately respond to the legal error here. I recognize that the petitioner may not be completely without fault with respect to this issue because he may have had sufficient time between the time he was first denied temporary fees until the beginning of the hearing, during which time he could have worked more diligently to present the temporary fee issue for resolution and obtain representation. We have no record as to the availability or nonavailability of hearing time during that period. However, during the first two days of the dissolution hearing, the trial court refused to rule on entitlement as requested. The court was in possession of documentation concerning the financial status of both parties and, therefore, could have properly considered need and ability to pay and received any testimony and evidence desired as counsel did appear on both occasions. The trial judge even stated that petitioner would likely receive fees, but proceeded to refuse a determination until the end of the trial. The court was presented with an attorney who stated that she knew of no attorney in Palm Beach County who would represent this petitioner without a determination of entitlement to fees, and, therefore, by refusing to rule on entitlement, the court rendered it virtually impossible for the petitioner to secure representation for a fair and just proceeding. While I make no comment regarding whether petitioner was in fact entitled to temporary attorneys' fees or the amount thereof, it is unquestionable that he had a right to a ruling by the trial court, at the time the motion was presented for consideration, regarding whether he was at least entitled to receive temporary attorneys' fees and costs. The trial court's refusal to rule was an error of law, and was the first misstep in a journey that eventually led to a father, who was forced to defend himself, losing all rights with regard to his child. The record contains substantial information as to the prejudicial impact caused by both the lack of counsel and resources for the expert-dominated proceeding.
Finally, the final judgment in the instant action not only stripped a father of his parental rights without due process, it also simultaneously deprived a minor child of a guardian ad litem to protect his best interests, resulting in the prohibition of any form of contact or communication with his *406 father, including even a simple telephone call for a number of years. In addition, the final judgment outlined drastic measures to ensure the father would have absolutely no contact with his son, including: denying the father's "request for any geographical restriction"; advocating that the mother relocate "to another area of the country or out of the country" because it may be beneficial to the child, whose conduct could be more closely monitored and limited; precluding the father from contacting the mother in any fashion whether "by telephone, writings, records, videos, or the like"; and even specifically granting the mother permission to record all conversations by the child to ensure the child does not speak with his father. Final Judgment of Dissolution of Marriage at 21, 23-24. The final judgment unequivocally severs all of the father's parental rights and proceeds so far as allowing the tapping of telephones to preclude the father from even inquiring about the health and safety of his child. In my view, it is clear that the trial court, in adopting the wife's proposed final judgment without modification, failed to protect, and even destroyed, any chance of a relationship between this father and son.
Florida has established, and prides itself in, a strong public policy in favor of protecting the relationship between parents and their children. See In re E.H., 609 So.2d 1289, 1290 (Fla.1992). Terminating a parent's parental rights within a marriage dissolution order, without at least affording some limited safeguards to the parent or child of the statutory provisions governing the termination of parental rights, is fundamentally incompatible with our system of justice and fairness. This Court does not, and should not, condone the termination of parental rights without first affording a parent due process. See J.B. v. Fla. Dep't of Children & Family Servs., 768 So.2d 1060, 1065 (Fla.2000).
Parental rights may be terminated through adoption, see § 63.062, Fla. Stat. (2003), or the strict procedures outlined in the statutes governing the termination of parental rights. See § 39.801, Fla. Stat. (2003). In any termination of parental rights proceeding, the court must appoint a guardian ad litem to represent the best interests of the child before the court may terminate parental rights. See § 39.807(2)(a), Fla. Stat. (2003). Unlike a specific action for the termination of parental rights, the court may, but is not required to, appoint a guardian ad litem to ensure the best interests of the child in an action for dissolution of marriage, modification, parental responsibility, custody, or visitation. See § 61.401, Fla. Stat. (2003). In this action, the trial court was not required to strictly follow the procedures governing the termination of parental rights under chapter 39 of the Florida Statutes because the instant action involved a dissolution of marriage, but the trial judge should have utilized a cloak of authority and jurisdiction to at least address independently the child's best interests.
Regardless of the nature of the instant action, the final judgment severed the unrepresented father's parental rights. The judgment ordered the father to
have absolutely no contact with the parties' child until the child reaches age 14. No contact with the child forthwith shall include but not be limited to ... the following:
A. No telephone contact.
B. No e-mail contact.
C. No computer contact.
D. No videos.
E. No visitation.
F. No visits at school.
G. No records from school.

*407 H. No records from any health care providers.
I. No contact indirectly by third parties on behalf of the Husband, whether they are relatives or otherwise.
... However, after the child reaches age 14, the Husband may petition the court to allow contact upon a showing of a substantial change of circumstances in the best interest of the child.
Final Judgment of Dissolution of Marriage at 20-21. This judgment extended far beyond a termination of parental rights; it even prohibited the simplest of birthday cards or even the conveyance of love and concern through other "approved" persons. This was nothing less than the execution of a parental relationship in a judgment authored by adverse counsel. The Fourth District below held that the "final judgment does not terminate [the father's] parental rights. Instead, it suspends them until the child reaches the age of fourteen." Perlow, 816 So.2d at 215. Notwithstanding the Fourth District's characterization of the final judgment as merely suspending parental rights, I most respectfully disagree with such a characterization and view the attorney-authored final judgment as effectively terminating the father's parental rights for a definite number of years with no guarantee that the terminated parental rights will ever be reinstated. Functionally, the final judgment strips the father of his parental rights and allows the court to bypass the procedures delineated in our laws for the termination of parental rights. The final judgment is even worse than a termination of parental rights because even a termination of rights would not extend to the prohibitions inserted in this final judgment by adverse counsel.
Although the final judgment allows the father, after the child reaches age fourteen, to petition the court to allow contact with his child, the final judgment order on its face amounts to a total deprivation of the father's parental rights. The significance of the termination of this relationship has been recognized by this Court when we reasoned:
The significance of the rights at issue here cannot be overstated. In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court considered termination of parental rights procedures under New York law. At issue in Santosky was whether the "fair preponderance of the evidence" standard prescribed by the New York Family Court Act for the termination of parental rights violated the parents' due process rights. 455 U.S. at 747, 102 S.Ct. 1388. The Santosky Court made it clear that state intervention to terminate parental rights must be accomplished by procedures meeting the requisites of due process. As the Santosky Court explained, it is
"plain beyond the need for multiple citation" that a natural parent's "desire for and right to `the companionship, care, custody, and management of his or her children' "is an interest far more precious than any property right.... "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."
455 U.S. at 758, 102 S.Ct. 1388 (quoting Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Moreover, the Supreme Court stated that the fundamental liberty interest a parent has in the custody and care of his or her child "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." Id. at 753, 102 S.Ct. 1388,. *408 J.B., 768 So.2d at 1064. Procedural safeguards should not be circumvented by allowing a court to simply fix a date, when the child reaches age fourteen, to provide the illusion of a temporary suspension and avoid the reality that the termination may be permanent. It is certainly total and absolute for a number of years. In this scenario, the trial judge should have taken steps, such as appointment of an independent guardian ad litem, a third party independent expert, or some other measure to independently protect the best interests of the child and to safeguard the child's relationship with his father. Its failure to do so is not, in my view, a matter of discretion to which any reviewing court must defer, but an error of law amounting to a denial of the due process rights of the unrepresented father and son. This Court should not allow a final judgment such as occurred in this case to be concealed and approved behind a cloak of discretion in appointing a guardian ad litem in a marriage dissolution proceeding when the final judgment in this proceeding essentially goes further than terminating a father's parental rights, which under all other circumstances requires representation and at least the appointment of an independent source to protect the rights of all involved.
I believe this case is an example of a continuing trend in appellate review in this state to apply the cloak of judicial discretion to approve lower court decisions riddled with errors. In rendering the decision today, this Court takes a modest step toward rectifying a pattern with which many have had a growing concern that we are alienating the public's trust in the judiciary as a body capable of seeking truth and bringing thoughtful, just, predictable, and certain resolution to a host of human problems. Ultimately, I suggest that the success of the efforts to create a unified family court system in this state depends upon our ability to properly respond to the multitude of family issues. I fear failure if judges are allowed to deviate on fundamental principles of law under an ever-expanding face of exercising due discretion. Those entrusted with the integrity and preservation of the court system must ensure that the process is protected, that attorneys can provide their clients informed advice based on uniformly applicable rules, that issues impacting our children have proper consideration, and that litigants enter the courthouse door with the well-founded belief that justice will be served and that opposing counsel will not be performing the adjudicatory function.
NOTES
[1] Esig Perlow graduated from the University of Chicago's law school, subsequently passed the California bar, and was later disbarred. He neither took the Florida bar examination nor worked in the legal profession here.
[2] Adam was eight years old at the time.
[3] Instead, the Fourth District viewed it as a mere suspension of the husband's parental rights. Perlow, 816 So.2d at 215.
[4] The record does not reflect that the trial judge asked either party to prepare a proposed final judgment. Nonetheless, counsel for the wife presented such a proposal just before closing arguments. At the conclusion of closing arguments, the trial judge informed the husband that he need not submit a proposed final judgment, indicated that a final order would be ready in two hours, and entered the proposed final judgment submitted on behalf of the wife without any additions, deletions, or modifications.
[5] Indeed, the final judgment entered in this case, which denies the husband all contact with his child until age fourteen and then only on petition to the court, is so one-sided in its findings and conclusions that it could only reflect the views of the party that drafted and proposed it.
[6] Because there will be a new trial in this case, we decline to address the other two issues that the husband has raised.
[7] I would also note that the husband went through three separate attorneys. Although the record does not reflect the reasons for this, I assume either that the representation stopped when the husband's money for attorneys' fees was exhausted or that the husband was the classic unreasonable or difficult client who would be a challenge to any attorney. See Sanford M. Portnoy, Effectively Representing the Unreasonable Client, Commentator, Sept. 2003, at 22.
[8] The wife paid $800,000 in attorneys' fees through the end of trial and more than $3.5 million in assets is at stake.
[9] Notably, although the opinion of the Fourth District with respect to this issue is arguably not in express and direct conflict with a decision from this Court or another district court of appeal, this Court is not precluded from addressing this issue here. It is well settled that "once this Court has jurisdiction of a cause, it has jurisdiction to consider all issues appropriately raised in the appellate process." Savoie v. State, 422 So.2d 308, 312 (Fla. 1982); see also Caufield v. Cantele, 837 So.2d 371, 377 n. 5 (Fla.2002).
[10] I must highlight here what I consider to be a most egregious, entirely inappropriate argument that was made on the first day of the dissolution hearing and again in the brief to this Court by the respondent. On both occasions, the respondent suggested that because petitioner had attended law school and had, at one time, been a member of the California bar, he could effectively represent himself in the dissolution action. Any such suggestion is highly misleading and inappropriate. There is no evidence the petitioner has ever been a member of the Florida Bar, there is no evidence that he has ever handled any type of domestic relations case, and the unrefuted evidence was that he has most recently worked in the food industry. On the first day of the hearing, after the respondent's attorney informed the trial court that petitioner was a lawyer, the petitioner stated that while he had attended law school and passed the California bar, it had been more than twenty years since he had practiced law in California. There is nothing to suggest that simply because petitioner had attended law school and at one time had a license to practice law, he was capable of effectively representing himself. A party's status as having a legal education without actual practice in twenty years, should not, in any way, be used to prejudice the trial court's determination of a party's entitlement to temporary fees. It was completely inappropriate for the respondent's attorney to even suggest that the petitioner was capable of his own representation simply because he had, at one time, been a licensed attorney in another jurisdiction. To further compound the error, petitioner's attempt to cross-examine one of the experts was transformed by the opposition into an argument that the cross-examination itself was evidence of the petitioner's mental disorder.