159 So.2d 231 (1963)
STATE of Florida and the Taxpayers, Property Owners and Citizens of Said Halifax Hospital District, Including Non-Residents Owning Property or Subject to Taxation Therein, Appellants,
v.
HALIFAX HOSPITAL DISTRICT, a special tax district in Volusia County, Florida, Appellee.
No. 32932.
Supreme Court of Florida.
December 18, 1963.
Dan R. Warren, Daytona Beach, and Charles Graham Carothers, for appellants
E.W. Crotty, Daytona Beach, for appellee.
THORNAL, Justice.
By direct appeal we have for review a decree of a circuit judge validating an issue of "hospital revenue bonds."
We must decide whether the proposed issue, without supporting approval of the freeholders of the district, violates the requirements of Section 6, Article IX, Florida Constitution, F.S.A.
Halifax Hospital District was created by Chapter 11272, Laws of Florida, 1925. By Chapter 63-2019, Laws of Florida, 1963, the original act was amended to authorize the Board of Commissioners of the District to build additions to an existing hospital. The 1963 Act authorized the issuance of bonds and made other provisions for the sale of bonds and the construction of the new facility. The Act also provided in effect that so long as any of the bonds shall be outstanding the power to assess and levy annual taxes for the operation, maintenance and repairs of the hospital shall not be repealed or reduced. It further provided that the millage currently being levied for the purpose of operation and maintenance of the hospital shall not be reduced except under specified circumstances. The Board of Commissioners of the District have, by resolution, proposed to issue $2,400,000.00 hospital revenue bonds. The authorizing resolution pledges to the payment of the bonds *232 the gross revenues of the hospital. Further, by the authorizing resolution it is agreed that the currently assessed ad valorem levy for maintenance and operation of the hospital will not be reduced during the life of the bonds. The District, of course, commits itself to operate and maintain the hospital. It agreed that the proceeds of the ad valorem levy, which is shown to be four mills, shall be deposited in the operating fund established by the authorizing resolution. It is stated that the bonds shall not constitute debts of the county. The circuit judge sustained the validity of the proposed issue. This decree is now here for review.
The appellant contends that the commitment of the gross revenues of the project to the payment of the bonds necessarily creates an indirect pledge of the taxing power to maintain and operate the hospital and, at all events, the specific pledge of ad valorem taxes for operation and maintenance does violence to Article IX, Section 6, Florida Constitution.
The appellee District contends that the gross revenues only are pledged to the payment of principal and interest and that the pledge of ad valorem taxes is merely in the nature of a special assessment which is not prohibited by the Constitution.
Article IX, Section 6, Florida Constitution, reads as follows:
"* * * the Counties, Districts, or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law; * * *."
We have held that any device whereby the exercise of the ad valorem taxing power is pledged and can directly or indirectly be compelled to meet the obligation of the securities is a "bond" which requires freeholder approval under Article IX, Section 6, supra. Sullivan v. City of Tampa, 101 Fla. 298, 134 So. 211; Leon County v. State, 122 Fla. 505, 165 So. 666; Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 So. 356; Neff v. City of Jacksonville, 139 Fla. 179, 190 So. 468. The nature of the security issued and the covenants of the bond contract, rather than the name given to the security must be the determining factors.
We have many times upheld a pledge of the net revenues of a project to the liquidation of securities. The problem presented here, however, involves a pledge of the gross revenues of the facility to the payment of principal and interest coming due on the bonds. In addition, there is an irrevocable, obligatory commitment to levy and collect a four mill ad valorem tax for the operation and maintenance of the hospital during the life of the bonds. This pledge of ad valorem taxes is as much an obligation of the bond resolution as is the pledge of the gross revenues. Under Article VIII of the bond resolution the bondholders or the bond trustee is authorized to enforce by appropriate proceedings any and all of the covenants of the resolution. Under certain circumstances a breach of any of the covenants could result in a declaration that the entire balance due on the bonds would become payable. We simply have here a pledge of gross revenues plus a pledge of a maximum of four mills per year. It is the obligation of the District, and the county commissioners under Chapter 63-2019, supra, to levy the ad valorem tax during the life of the bonds that generates our concern.
The appellee points to certain prior decisions by which the pledge of gross revenues of a project have been permitted to secure an issue of bonds. These cases add no support for the far-reaching proposal here submitted. In none of them did the bond resolution bindingly commit the issuing agency *233 to the levy of an ad valorem tax to meet any of the obligations of the bond contract. Here the district obligates itself to build the facility, and operate and maintain it at all times. These are mutually obligatory covenants. The cost of the construction is payable out of gross revenues. The cost of operation and maintenance is payable out of the four mill ad valorem levy. The obligation of the bonds comprehends the pledge of both the gross revenues and the ad valorem tax.
In State v. City of Winter Park, 160 Fla. 330, 34 So.2d 740, there was a pledge of gross revenues of a sewer system supplemented by a pledge of utilities excise taxes. There was no pledge of ad valorem taxes. In Wolfe v. City of Ft. Lauderdale, Fla., 47 So.2d 781, there was a pledge of gross revenues which were shown by the evidence to be adequate to liquidate the bonds plus the cost of operating the facility. There was no pledge of ad valorem taxes. In fact, the possibility of an ad valorem tax levy in the future  even on an annual, non-obligatory basis  was left open to question. The identical situation obtained in State v. North Broward Hospital District, Fla., 95 So.2d 434.
In State v. City of West Palm Beach, Fla., 125 So.2d 568, there was a pledge of parking meter revenues with a commitment to maintain an adequate operating fund out of these revenues plus "other available funds of the city" provided that "no such deposit shall be made from moneys derived from ad valorem taxes * * *." Almost the identical arrangement was approved in Sanibel-Captiva Taxpayers Ass'n. v. County of Lee, Fla., 132 So.2d 334. The pledge of collateral supporting revenues for operations expressly excluded ad valorem sources.
We have epitomized the holdings cited by appellee in support of the instant issue to demonstrate that in no instance has this Court upheld the pledge of gross revenues of a facility coupled with a supporting pledge of ad valorem taxes. When gross revenues have been pledged with collateral support for operating the facility, the supporting revenues pledged have always been derived from sources other than ad valorem levies. On the contrary, in the instant situation ad valorem taxes are specifically obligated to meet the covenants of the bond resolution. The mere fact that the ad valorem tax commitment is pledged to operations and maintenance is a distinction without a difference. The District borrows money and issues "revenue certificates" to evidence the debt. In order to borrow the money it agrees to do two things: (1) build hospital facilities, and (2) operate and maintain the hospital. To meet these obligations it pledges two revenue sources: (1) the gross revenues to pay principal and interest, and, (2) ad valorem taxes to pay the operating and maintenance costs. In order to produce the gross revenues to pay off the bonds, the hospital must be operated. In turn, in order to operate the hospital the ad valorem taxes must be levied and collected. The obligations to pay and the committed sources of revenue are so clearly inter-dependent that it is impossible to separate the one from the other.
To support the levy of the ad valorem tax we are asked to hold that the levy of the tax is merely a "special assessment" for the benefit of all the property of the District and therefore, not a "tax" in the contemplation of Article IX, Section 6, supra. Clearly this contention overlooks the established distinction between an "assessment for special benefit" and an "ad valorem tax."
Appellee points to the decision in State ex rel. Ginsberg v. Dreka, 135 Fla. 463, 185 So. 616. That was a mandamus proceeding to enforce a levy for a particular year. It was not a bond validation case. More vitally, however, was the time and posture in which the case reached the Court. It was a successful effort to compel the assessment of this same hospital operating tax against homesteads in the District. It was decided under a 1934 provision *234 when Article X, Section 7, Florida Constitution, the Homestead Exemption Amendment, provided in part:
"There shall be exempted from all taxation other than special assessments for benefits, to every head of a family * * *." (Emphasis added.)
The Court held that the hospital operating tax was in the nature of a special assessment for benefits to all of the property in the District.
Subsequent to Dreka, however, the Court in Crowder v. Phillips, 146 Fla. 428, and on rehearing, 146 Fla. 440, 1 So.2d 629, reached a substantially different conclusion in the light of the 1938 amendment to Article X, Section 7, supra.
When Crowder was decided in 1941, Article X, Section 7, supra, had been amended to read in part as follows:
"Sec. 7. Every person who has the legal title or beneficial title in equity to real property in this State and who resides thereon and in good faith makes the same his or her permanent home, or the permanent home of another or others legally or naturally dependent upon said person, shall be entitled to an exemption from all taxation, except for assessments for special benefits, up to the assessed valuation of Five Thousand Dollars on the said home and contiguous real property, * * *." (Emphasis added.)
It should be noted that the original language permitted "special assessments for benefits", the latter amendment was much more restrictive, and permitted only "assessments for special benefits."
Thus it was that when the problem recurred in 1941, in Crowder v. Phillips, supra, a Leon County Hospital District case, the Court held:
"It is clear that the tax to be imposed under the provisions of the law under attack is ad valorem on all real and personal property as distinguished from assessments for special benefits to the real property located in the district. That a hospital is a distinct advantage to the entire community because of its availability to any person who may be injured or stricken with disease cannot be gainsaid, but there is no logical relationship between the construction and maintenance of a hospital, important as it is, and the improvement of real estate situated in the district. * * *"
We noted this important change of constitutional language in Fisher v. Board of County Commissioners of Dade County, Fla., 84 So.2d 572. We there cautiously pointed out the fundamental differences between an "ad valorem tax" and an "assessment for special benefits." We repeat from Fisher a summary of those differences because they are appropriate here:
"Perhaps the true nature of the `assessment' here involved can best be revealed by a typical illustration of the contrast between an ad valorem tax and an assessment for special benefits. The typical ad valorem levy is the annual imposition for the operation of the government the amount of which is measured by the budget adopted, the assessed valuation of taxable property and the levy (usually in mills) against the taxable property sufficient to produce the amount necessary to meet the budget. The ad valorem tax on a particular parcel is apt to vary from year to year and it will fluctuate annually in proportion to changes in assessed valuation or the amount of the millage.
"An `assessment for special benefits' on the other hand is customarily a fixed amount assessed against a particular parcel of land arrived at by totalling the cost of a public improvement and apportioning it against abutting *235 property specially benefited usually on a front foot or acreage basis without regard to ad valorem valuation of the land. While it is most often payable in annual installments, the amount of such installments is usually fixed at the time the initial levy is made and they do not fluctuate from year to year as the result of changes in ad valorem valuation or increases in the cost of maintaining the improvement."
An assessment for special benefits is illustrated by City of Orlando v. State, Fla., 67 So.2d 673, which involved typical paving and sewer assessments. This type of assessment could be pledged but it was squarely distinguished from the typical ad valorem tax pledged by the instant bond resolution.
In State v. Florida State Improvement Commission, Fla., 60 So.2d 747, we felt compelled to deny validity to a proposed issue of hospital bonds which were to be liquidated out of Madison County's share of race track funds with a contingent supporting pledge of a three mill ad valorem tax. There, admittedly, the three mill tax could be used, if needed, to pay off the bonds or operate the hospital. However, we can see little, if any, distinction between an obligatory commitment to levy a tax to pay principal and interest, and a binding agreement to levy a tax to pay equally essential operating costs. Both are components of the bond contract. Both could be enforced by the bondholders under the agreement.
Again, in State v. County of Manatee, Fla., 93 So.2d 381, we held invalid a limited pledge of ad valorem taxes to the liquidation of hospital improvement bonds proposed pursuant to Section 135.01, Florida Statutes, F.S.A. We there reviewed a number of applicable precedents which would be equally appropriate here.
We have presented to us here another proposal involving an apparent attempt to circumvent the organic requirements of freeholder approval of a funding operation which directly commits the exercise of the ad valorem taxing power. It may be that the proposed improvement is badly needed and should be accomplished in the public interest. The fact remains, however, that the Constitution requires that the people who are to pay the bill should be given an opportunity to approve the debt before it is incurred. Article IX, Section 6, Florida Constitution, was written into the organic law in 1930 as a safeguard against a recurrence of Florida's sad experience resulting from the so-called "boom" of the nineteen twenties. The people placed this safeguard in the organic law as a protection to themselves. We did not write the Constitution. We have no power to tamper with it. As we indicated in State v. County of Manatee, supra, it is not for us to decide whether Article IX, Section 6, is wise and salutary. This provision is an expressed limitation on the exercise of an important power of government  the power to tax. Until it is removed by those who placed it there, we and all other public officials are bound by it. If the proposed hospital addition is as badly needed as the briefs represent it to be, we feel justified in suspecting that when properly presented to the freeholders as the Constitution requires, it will receive their endorsement. Under the Constitution we have no power to substitute our judgment for that of the freeholders. To do so would be rank usurpation.
The decree of validation is reversed and the cause is remanded for appropriate proceedings consistent herewith.
It is so ordered.
TERRELL, Acting C.J., and THOMAS, ROBERTS, O'CONNELL, CALDWELL and HOBSON (Ret.), JJ., concur.