992 So.2d 150 (2008)
Dr. Gregory L. STRAND, Appellant,
v.
ESCAMBIA COUNTY, Florida, etc., et al., Appellees.
No. SC06-1894.
Supreme Court of Florida.
September 18, 2008.
*151 David A. Theriaque, S. Brent Spain, and Timothy E. Dennis of Theriaque, Vorbeck and Spain, Tallahassee, Florida, and Kerry Ann Schultz of Bordelon and Schultz Law Firm, P.L., Gulf Breeze, FL, for Appellant.
Richard Lott of Lott and Associates, P.L., Gulf Breeze, Florida, Patricia Lott of Miller, Canfield, Paddock, and Stone, P.L.C., Pensacola, Florida, and Elaine Johnson James of Edwards, Angell, Palmer, and Dodge, LLP, West Palm Beach Florida, for Appellees.
David G. Tucker and Robert L. Nabors of Nabors, Giblin and Nickerson, P.A., Tallahassee, Florida, and Major B. Harding of Ausley and McMullen, P.A., Tallahassee, Florida, on behalf of Florida Association of Counties and Florida School Boards Association, Inc.; Randall W. Hanna of Bryant, Miller, and Olive, P.A., Tallahassee, Florida, and Harry Morrison, Jr., Tallahassee, Florida, on behalf of the Florida League of Cities, Inc.; Stephen H. Grimes of Holland and Knight, LLP, Tallahassee, Florida, and David E. Cardwell of The Cardwell Law Firm, Orlando, Florida, on behalf of the Florida Redevelopment Association, Inc.; and Scott D. Makar, Solicitor General, Craig D. Feiser, and Charles B. Upton, II, Deputy Solicitors General, Tallahassee, Florida, on behalf of Attorney General Bill McCollum, as Amici Curiae.
WELLS, J.
We have before us an appeal from a final judgment validating a proposed bond *152 issue from the Circuit Court of the First Judicial Circuit, in and for Escambia County, Florida. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. Upon consideration of appellee Escambia County's motion for rehearing, we withdraw our revised opinion, filed on September 28, 2007, and substitute the following opinion. We affirm the circuit court's final judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND
On May 4, 2006, Escambia County (County) adopted Ordinance 2006-38 (Ordinance). The Ordinance establishes the Southwest Escambia Improvement District (District) in the southwest portion of the County, running to the peninsula known as Perdido Key. The Ordinance also establishes the Southwest Escambia Improvement Trust Fund (Trust Fund), which will be used to finance or refinance infrastructure improvements in the District, and authorizes the use of tax increment financing to fund the Trust Fund. In conjunction with the adoption of the Ordinance, the County adopted Resolution R2006-96 (Resolution) on May 4, 2006, authorizing the County to issue bonds not exceeding $135,000,000 for the District. The stated purpose of these bonds is to finance a four-lane road-widening project in the District to improve economic development within that area and alleviate traffic congestion. The bonds are to reach maturity no later than the thirty-fifth year after revenues are first deposited into the Trust Fund.
The Ordinance provides that the bonds are to be "payable out of revenues pledged to and received by the County and deposited to its Southwest Escambia Improvement Trust Fund." Ordinance § 4(4). The Ordinance requires the County to appropriate to the Trust Fund by February 1 of each year an amount equal to the "Tax Increment"[1] so long as any applicable indebtedness is outstanding. Id. § 4(1)-(3). The funds equaling the Tax Increment that are placed into the trust are known as "Tax Increment Revenues." Id. § 2.
The Resolution employs the term "Trust Fund Revenues," which are the moneys other than "Supplemental Revenues"[2] deposited in the Trust Fund pursuant to the provisions of the Ordinance. Resolution art. I, § 101 (May 4, 2006). The Resolution provides that the bonds shall be repaid from "Pledged Funds,"[3] which are the funds deposited in the Trust Fund *153 including the Trust Fund Revenues and the Supplemental Revenues. Id. art. III, § 301. The Resolution does require that if necessary, the County shall appropriate in its annual budget non-ad valorem revenues if available as Supplemental Revenues sufficient to secure the indebtedness in each fiscal year. However, the Resolution expressly states that the County does not covenant to maintain any services or programs now provided which generate non-ad valorem tax revenues. Id. § 304(m).
The Ordinance and the Resolution dictate that the bonds do not pledge the full faith and credit or taxing power of the County, the State, or any political divisions thereof. Section 4 of the Ordinance states as follows:
(4) The revenue Bonds and notes of every issue under this part are payable out of revenues pledged to and received by the County and deposited to its Southwest Escambia Improvement Trust Fund. The lien created by such bonds, notes or other forms of indebtedness shall not attach until the revenues referred to herein are deposited in the Southwest Escambia Improvement Trust Fund at the times, and to the extent that, such Tax Increment Revenues accrue. The holders of such bonds, notes or other forms of indebtedness have no right to require the imposition of any tax or the establishment of any rate of taxation in order to obtain the amounts necessary to pay and retire such bonds, notes or other forms of indebtedness.
(5) Revenue Bonds issued under the provisions of this part shall not be deemed to constitute ... a pledge of the faith and credit of the County or the state or any political subdivision thereof, but shall be payable solely from the revenues provided therefor.
Ordinance § 4(4)-(5). Section 103(i) of the Resolution reiterates that the bonds are payable solely from the Pledged Funds and "shall not constitute an indebtedness, liability, general or moral obligation, or a pledge of the faith, credit or taxing power of the Issuer, the State, or any political subdivision thereof." Section 301 adds that no bondholder
shall ever have the right to compel the exercise of the ad valorem taxing power of the Issuer, the State or any political subdivision thereof, or taxation in any form of any real or personal property therein, or the application of any funds of the Issuer, the State or any political subdivision thereof ... other than the Pledged Funds as provided in this Resolution.
Section 302 explains that the bonds "shall not constitute a lien upon any property owned by or situated within the corporate territory of the Issuer, but shall constitute a lien only on the Pledged Funds." Accordingly, no lien created by the bonds shall attach until the revenues are deposited in the Trust Fund. Finally, the Resolution includes a finding that "[t]he estimated Pledged Funds will be sufficient to pay all principal of and interest on the [bonds]." Resolution art. I, § 103(h).
On May 16, 2006, the County filed a complaint for validation in the Escambia County Circuit Court, seeking validation of the bond issuance. The state attorney promptly filed his answer, and Dr. Gregory Strand intervened pursuant to section 75.07, Florida Statutes (2006). Dr. Strand argued that the bond issuance was distinguishable from the bond issuance approved by this Court in State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla. 1980), and therefore required a referendum pursuant to the requirement of article *154 VII, section 12 of the Florida Constitution.[4]
On August 18, 2006, the circuit court entered the final judgment validating the bond issuance. The circuit court concluded that the County had the authority to issue the bonds and that the bonds were not subject to referendum pursuant to article VII, section 12. The circuit court cited to our decisions in Miami Beach and Penn v. Florida Defense Finance & Accounting Service Center Authority, 623 So.2d 459 (Fla.1993). Dr. Strand, the intervenor, appeals that final judgment.

II. STANDARD OF REVIEW
In City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003), this Court explained the scope of a bond validation proceeding as follows:
We have previously explained the scope of a bond validation proceeding: "[C]ourts should: (1) determine if a public body has the authority to issue the subject bonds; (2) determine if the purpose of the obligation is legal; and (3) ensure that the authorization of the obligation complies with the requirements of law." State v. City of Port Orange, 650 So.2d 1, 2 (Fla.1994).
This Court reviews the "trial court's findings of fact for substantial competent evidence and its conclusions of law de novo." Id. (citing Panama City Beach Cmty. Redev. Agency v. State, 831 So.2d 662, 665 (Fla.2002); City of Boca Raton v. State, 595 So.2d 25, 31 (Fla.1992)). The final judgment of validation comes to this Court clothed with a presumption of correctness. Wohl v. State, 480 So.2d 639, 641 (Fla. 1985).

III. ANALYSIS
Dr. Strand raises three issues in his appeal: (A) whether the circuit court abused its discretion in denying his motion for continuance; (B) whether the circuit court's final judgment is supported by competent, substantial evidence; and (C) whether the bonds required a referendum pursuant to the requirement of article VII, section 12 of the Florida Constitution.

A. Denial of Continuance
On June 29, 2006, the day before the bond validation hearing, Dr. Strand filed a motion for a thirty-day continuance, asserting that his counsel did not learn of the bond validation hearing until June 27, 2006. A continuance is within the discretion of the trial judge and will not be reversed absent a clear showing of abuse. See Perlow v. Berg-Perlow, 875 So.2d 383, 387 (Fla.2004); Lebron v. State, 799 So.2d 997, 1018 (Fla.2001). We find that the circuit court did not abuse its discretion in denying Dr. Strand's motion for a continuance.
Section 75.06, Florida Statutes (2006), provides that notice of a bond validation hearing shall be effectuated by publishing notice in a newspaper published in the territory to be affected by the issuance of the bonds for two consecutive weeks, commencing *155 not less than twenty days before the date of the hearing. The record establishes that the notice was published more than one month prior to the June 30, 2006, validation hearing, on May 24, 2006, and again on May 31, 2006, in the Pensacola News Journal. The record also establishes that notice of intent to adopt the ordinance was published on April 23, 2006. Thus, the County provided sufficient notice. Furthermore, Dr. Strand has not demonstrated that he was prejudiced by the denial of his motion for a continuance. Dr. Strand's motion asserted that his counsel needed additional time to investigate "factual issues of notice" and "legal issues." As discussed above, proper notice was provided, and accordingly, Dr. Strand was not prejudiced by any inability to pursue the issue of notice before the circuit court. As for legal issues, Dr. Strand was permitted to make an oral argument at the hearing and to then file a legal memorandum outlining his legal arguments following the hearing. This opportunity to file a legal memorandum ensured that Dr. Strand's arguments could be fully presented to the circuit court before the entry of the final judgment on August 18, 2006.
Given the adequacy of the notice provided and the circuit court's accommodation that ensured that Dr. Strand's arguments could be heard, we find that the circuit court did not abuse its discretion in denying Dr. Strand's motion.

B. Competent, Substantial Evidence
Dr. Strand argues that the circuit court's adoption of the County's proposed final judgment was an improper delegation of its authority to make independent findings of fact under Perlow. We find this contention is without merit. In Perlow, we did not hold that a trial court's adoption of a proposed final judgment verbatim is improper per se, but rather, we held that "[w]hile a trial judge may request a proposed final judgment from either or both parties, the opposing party must be given an opportunity to comment or object prior to entry of an order by the court." 875 So.2d at 390. In the instant case, unlike in Perlow, the circuit court's adoption of the proposed final judgment does not lead to the appearance of impropriety. Rather than ruling within hours of the hearing as occurred in Perlow, the circuit court in this case deliberated for six weeks before adopting the County's proposed order. Although the trial court did not specifically ask Dr. Strand for a proposed final judgment, the circuit court reserved judgment until receiving legal memoranda from the parties, thereby giving Dr. Strand an opportunity to object and to propose a final order. Thus, Dr. Strand was afforded a meaningful opportunity to review the County's proposed final judgment, make objections, and make his own proposals. Therefore, the circuit court's adoption of the County's proposed final judgment was not improper.
Dr. Strand next argues that the findings of fact contained in the circuit court's final judgment are not supported by competent, substantial evidence in the record. Specifically, Dr. Strand challenges the circuit court's findings that the District project is necessary and serves a public purpose; that there is a sufficient nexus between the property within the District and the benefits of the project to be financed by the bonds; and that the public improvements to be financed by the revenue bonds are necessary. Dr. Strand's argument is without merit.
In this case, the County offered into evidence the Ordinance and the Resolution, and presented testimony concerning the purpose of the project and the tax increment financing mechanism. In its final judgment, the circuit court relied primarily on the legislative findings contained *156 in the Ordinance and the Resolution. This Court has held that "legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous." Boschen v. City of Clearwater, 777 So.2d 958, 966 (Fla.2001) (quoting State v. Housing Fin. Auth. of Pinellas County, 506 So.2d 397, 399 (Fla. 1987)). The findings in the Ordinance and the Resolution must be accorded great deference by the trial court, and Dr. Strand has not demonstrated the findings to be clearly erroneous. Moreover, this Court has recognized that the admission of a resolution may be sufficient evidence justifying a bond validation. In Rianhard v. Port of Palm Beach District, 186 So.2d 503, 505 (Fla.1966), this Court explained:
Appellants question the fact that plans and specifications of the proposed improvements were not offered in evidence by appellee.
We think the introduction of the supporting resolution in evidence is all that was necessary to justify validation. In State of Florida v. Manatee County Port Authority, 171 So.2d 169 [Fla. 1965], we approved as sufficient evidence to justify validation of revenue certificates similar to those in this case only the introduction of the supporting resolution covering that issue. Nor did we there find it necessary that detailed plans and specifications of the proposed improvements to be undertaken from the funds of the proposed revenue certificates be submitted in evidence.
Likewise in this case, the legislative findings are competent, substantial evidence sufficient to support the final judgment.

C. Legal Authority to Issue Bonds Without a Referendum
The circuit court determined that the bonds could be validated without the referendum required by article VII, section 12, Florida Constitution, because the bonds to be issued under the Ordinance and the Resolution do not constitute an indebtedness, liability, or pledge of the faith, credit, or taxing power of the County. On appeal, Dr. Strand argues that the bonds should not have been validated because the County did not comply with the Community Redevelopment Act, chapter 163, Florida Statutes. The County responds that chapter 163 does not apply to the County's issuance of the bonds. Rather, the County intends to issue the bonds based upon the powers granted to the County by section 125.01, Florida Statutes (2006).[5] We agree with the County. We find that this issue is controlled by our decision in Penn, in which we previously affirmed the Escambia County Circuit Court's validation of bonds issued under a *157 similar tax ordinance and resolution and issuance structure.[6]
Dr. Strand further argues, as the appellant in Penn contended, that this financing mechanism violates article VII, section 12 of the Florida Constitution, which requires a referendum for bonds payable from ad valorem taxation and maturing more than twelve months after issuance. We rejected this argument in Penn because we found the financing mechanism in that case indistinguishable from the financing mechanism that we approved in Miami Beach. Likewise, we find that the financing mechanism in the instant case is not distinguishable from that which we approved in the Miami Beach case. Thus, we reject Dr. Strand's argument that the bonds in this case require a referendum.
On rehearing, Dr. Strand argues, and the dissenters to our present opinion agree, that we should recede from our decision in Miami Beach. In Miami Beach, we reviewed a judgment of the Circuit Court for Dade County which validated bonds issued pursuant to sections 163.385 and 163.387, Florida Statutes (1977), which authorized the issuance of bonds utilizing tax increment financing to finance redevelopment projects.
In Miami Beach, the opponents of the bond issuance contended that the bonds were payable from ad valorem taxation and therefore required a referendum. The opponents maintained that the bonds were payable from ad valorem taxation because the required contributions of Dade County and the City of Miami Beach to the repayment fund were to be derived from taxes levied on the real property in the redevelopment area. In response, the Miami Beach Redevelopment Agency (Agency) argued that the bonds did not come within the referendum requirement because there was no pledge of the ad valorem taxing power of the county and city. Miami Beach, 392 So.2d at 893-94. In its brief, the Agency maintained that "[t]he crux of the matter is that there is no pledge of the ad valorem taxing power to which bondholders may look, and which they may legally enforce, as a source of funds to pay the bonds." Answer Brief to Initial Brief of Appellant at 32, State v. Miami Beach Redev. Agency, 392 So.2d 875 (Fla.1980) (No. 57997).
In our Miami Beach opinion, we decided the issue in favor of the Agency stating:
The Agency contends in effect that where there is no direct pledge of ad valorem tax revenues, but merely a requirement of an annual appropriation from any available funds, the referendum provision of article VII, section 12 is not involved. We agree with this view....
392 So.2d at 894. We thereafter delineated the history of judicial precedents which led to our conclusion and held:
The bonds in the instant case are payable from a trust fund, and the fund will receive revenue from two sources. One source is the money the Agency receives from sales, leases, and charges for the use of, redeveloped property. This source is analogous to revenues generated by a utility or facility. The other source is the money to be contributed each year by the county and city, measured by the tax increment. The *158 source of this revenue is not limited to any specific governmental revenue. That the statutory duty to make the annual contributions would become a contractual duty, part of the obligation of the bonds, does not mean, however, that these bonds are payable from ad valorem taxation, in the constitutional sense of the term.
The Agency notes that even though the money the county and city will use to make the contributions may come from ad valorem tax revenues, we have indicated this does not bring the bonds within the referendum requirement. Tucker v. Underdown, 356 So.2d 251 (Fla.1978). In that case, county bonds previously issued without referendum to finance a solid waste disposal system had been validated as payable from user charges, giving bondholders no power to compel the levy of ad valorem taxes for operating expenses or debt service. The subsequent lawsuit concerned whether the county had violated the covenants of the earlier bond issue by levying and spending ad valorem taxes for these purposes. The Court held that it had not.

Tucker v. Underdown supports the argument that there is nothing in the constitution to prevent a county or city from using ad valorem tax revenues where they are required to compute and set aside a prescribed amount, when available, for a discreet [sic] purpose. The purpose of the constitutional limitation is unaffected by the legal commitment; the taxing power of the governmental units is unimpaired. What is critical to the constitutionality of the bonds is that, after the sale of bonds, a bondholder would have no right, if the redevelopment trust fund were insufficient to meet the bond obligations and the available resources of the county or city were insufficient to allow for the promised contributions, to compel by judicial action the levy of ad valorem taxation. Under the statute authorizing this bond financing the governing bodies are not obliged nor can they be compelled to levy any ad valorem taxes in any year. The only obligation is to appropriate a sum equal to any tax increment generated in a particular year from the ordinary, general levy of ad valorem taxes otherwise made in the city and county that year. Issuance of these bonds without approval of the voters of Dade County and the City of Miami Beach, consequently, does not transgress article VII, section 12.
Miami Beach, 392 So.2d at 898-99 (emphasis added). Two members of the Court dissented from this conclusion. In his concurring in part and dissenting in part opinion, Justice Boyd specifically expressed the view that the promised annual contributions to the trust fund based on the tax increment revenues constituted a pledge by the county and the city of their general revenue and made the bonds general obligation bonds, which were payable from ad valorem taxation. Id. at 900 (Boyd, J., concurring in part and dissenting in part). Thus, the arguments advocated here by Dr. Strand and the present dissenters were previously advanced in Miami Beach and rejected by this Court.
In 1990, we reinforced our holding in Miami Beach in our decision in State v. School Board of Sarasota County, 561 So.2d 549 (Fla.1990). We stated:
Regarding the bonds' validity, the issue presented is whether a referendum is required by article VII, section 12 of the Florida Constitution (1968). We conclude that because these obligations are not supported by the pledge of ad valorem taxation, they are not "payable from ad valorem taxation" within the *159 meaning of article VII, section 12, and referendum approval is not required.
In State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), we interpreted the words "payable from ad valorem taxation" in article VII, section 12 and held that a referendum is not required when there is no direct pledge of the ad valorem taxing power. We noted that although contributions may come from ad valorem tax revenues: "What is critical to the constitutionality of the bonds is that, after the sale of the bonds, a bondholder would have no right, if [funds] were insufficient to meet the bond obligations ... to compel by judicial action the levy of ad valorem taxation.... [T]he governing bodies are not obliged nor can they be compelled to levy any ad valorem taxes in any year." Id. at 898-99. The agreements here, as in Miami Beach, although supported in part by ad valorem revenues, expressly provide that neither the bondholders nor anyone else can compel use of the ad valorem taxing power to service the bonds.
Id. at 552 (footnote omitted) (alterations in original). Again, the majority's decision was met by a dissent, which maintained that the financing mechanism employed in those cases were equivalent to issuing bonds and pledging ad valorem taxation to support them. Again, the dissenters' view was rejected by the Court.
As referenced earlier, we affirmed the validation of a bond issuance in Escambia County in Penn on the basis of our decision in Miami Beach. We also relied on Miami Beach in affirming a bond validation in State v. Inland Protection Financing Corp., 699 So.2d 1352 (Fla.1997).
We have stated that we are committed to the doctrine of stare decisis. N. Fla. Women's Health & Counseling Services, Inc. v. State, 866 So.2d 612, 637 (Fla.2003). In that case, we pointed out that the "doctrine of stare decisis, or the obligation of a court to abide by its own precedent, is grounded on the need for stability in the law and has been a fundamental tenet of Anglo-American jurisprudence for centuries." Id. We observed that the doctrine was memorialized by this Court a century and a half ago in Tyson v. Mattair, 8 Fla. 107 (1858). We then set forth the questions to be considered when asked to recede from precedent, expressly stating that the presumption in favor of precedent is strong. The questions to be asked are:
(1) Has the prior decision proved unworkable due to reliance on an impractical legal "fiction"? (2) Can the rule of law announced in the decision be reversed without serious injustice to those who have relied on it and without serious disruption in the stability of the law? And (3) have the factual premises underlying the decision changed so drastically as to leave the decision's central holding utterly without legal justification?
N. Fla. Women's Health, 866 So.2d at 637. In the instant case, we do not find that the answers to these questions overcome the presumption in favor of stare decisis.
In answer to the first question, we have not been presented with evidence showing that the Miami Beach decision has proven unworkable due to reliance on a legal fiction. Rather, we find that the holding of the majority in Miami Beach was scrutinized and tested by the dissenters in Miami Beach and later in the School Board of Sarasota County decision, and determined by the Court's majority to be developed from seasoned historic precedent.
In answer to several questions, we conclude that for the past twenty-seven years there has been widespread reliance upon the Miami Beach decision in the issuance *160 of bond financing by local government authorities, including school boards, enabling the financing of many public works that have enhanced the quality of life in our State. Tax increment financing and the undergirding principles of our Miami Beach decision have been inextricably woven into the financial fabric of our State. We conclude that receding from the precedent of Miami Beach would cause serious disruption to the governmental authorities that have relied upon that precedent for planning public works that are in various stages of development and approval.
Finally, we do not find that any changes have occurred since the Miami Beach decision that affect that decision. There have in fact been no changes which would affect our construction of the applicability of article VII, section 12, to bond issues using the tax increment financing structure determined to be valid in Miami Beach  article VII, section 12 of the Florida Constitution has not been amended. The Constitutional Revision Commission which met in 1997 and 1998 proposed nine revisions to other sections of the Florida Constitution but did not propose any revision to the constitution that would change the holding of Miami Beach. See Fla. Constitution Revision Comm'n, Nine Proposed Revisions for the 1998 Ballot, http://www.law.fsu.edu/crc/ballot.html; Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250, 264 (Fla.2005) ("This determination [relating to the term `municipal or public purpose'] is consistent with the principle that the Legislature `is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed,' Florida Dep't of Children Families v. F.L., 880 So.2d 602, 609 (Fla. 2004), which is equally applicable on the constitutional level. See generally Coastal Fla. Police Benev. Ass'n v. Williams, 838 So.2d 543, 548 (Fla.2003) (stating that rules governing statutory construction are generally applicable to construction of constitutional provisions).").
Alternatively, Dr. Stand contends that if we do not recede from Miami Beach and its progeny, we should find that it does not control the decision in this case. Dr. Strand argues that, instead, this case should be controlled by this Court's decision in County of Volusia v. State, 417 So.2d 968 (Fla.1982). In that case, we affirmed the Volusia County Circuit Court's denial of validation of a bond issue in part because the circuit court found that Volusia County's pledge of all legally available revenues other than ad valorem taxes would have the effect of requiring the levy of increased ad valorem taxation so that, under article VII, section 12, the bonds could not be issued without a referendum. In County of Volusia, we specifically affirmed the circuit court, holding:
That which may not be done directly may not be done indirectly. See, e.g., State v. Halifax Hospital District, 159 So.2d 231 (Fla.1963). While the county has not directly pledged ad valorem taxes to the payment of the bonds, its pledge of all other available revenues, together with its promise to do all things necessary to continue to receive the various revenues, will inevitably lead to higher ad valorem taxes during the life of the bonds, which amounts to the same thing. We find in this case that the pledge of all available revenues, together with a promise to maintain the programs entitling the county to receive the various revenues, will have a substantial impact on the future exercise of ad valorem taxing power and brings this case within the rule of Halifax Hospital District. The taxpayers of Volusia County must have an opportunity to vote on the bond issue.
417 So.2d at 972. In the present case, the County argues that County of Volusia is *161 distinguishable because section 304(m)(1) of the Resolution expressly does not covenant to maintain any services or programs now provided or maintained by the County which generate non-ad valorem revenues. The County further points out that we approved a similar financing mechanism in Murphy v. City of Port St. Lucie, 666 So.2d 879 (Fla.1995).
We agree that as in City of Port St. Lucie, the instant Ordinance and Resolution differ from those in County of Volusia in that non-ad valorem revenues here are to be used only as a supplemental source of funding in the event that the Trust Fund revenues are insufficient for debt service and in that the County expressly does not covenant to maintain services or programs for the purpose of generating income to repay the bonds. See City of Port St. Lucie, 666 So.2d at 881.[7]

IV. CONCLUSION
For the reasons stated above, we affirm the final judgment of validation of the Escambia County Circuit Court.
It is so ordered.
ANSTEAD and PARIENTE, JJ., and CANTERO, Senior Justice, concur.
QUINCE, C.J., concurs in part and dissents in part.
LEWIS, J., dissents with an opinion, in which QUINCE, C.J., concurs.
BELL, J., recused.
LEWIS, J., dissenting.
In my view, the decision of Escambia County to issue tax-increment-financed bonds to fund a road-construction project without first obtaining approval through a constitutionally mandated referendum is contrary to the clear and plain words of article VII, section 12 of the Florida Constitution.[8] Here, without consulting the electorate, the County seeks to pledge thirty-five years' worth of ad valorem tax revenue as the primary funding source for a typical "capital project." Conversely, article VII, section 12 was clearly designed to address the expanding capital needs of local government, but was tempered by the inclusion of democratic control with regard to the decision to finance "capital projects" with long-term debt "payable from ad valorem taxation." Art. VII, § 12, Fla. Const.[9] In this road-construction context, the majority's avoidance of this clear command perpetuates and expands a distortion *162 of our fundamental organic law, leads us far beyond our prior precedent, and denies the voters of this State their constitutional right to determine whether their local governments should issue long-term debt that is "payable from ad valorem taxation," as that phrase is understood through its "usual and obvious meaning." City of Jacksonville v. Cont'l Can Co., 113 Fla. 168, 151 So. 488, 489-90 (1933) ("The words and terms of a Constitution are to be interpreted in their most usual and obvious meaning.... The presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them.").[10] With regard to typical "capital projects," such as Escambia County's road-expansion plan, the Constitution unmistakably communicates that entities of local government are required to use a referendum to obtain voter approval when a pledge of ad valorem tax revenue or ad valorem taxing authority is a source of payment for relevant forms of long-term debt. See art. VII, § 12, Fla. Const.
I write separately in this road-construction context to emphasize two additional points that, in my view, demonstrate the violence that expansion of the legal fiction of State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), visits upon the plain text and manifest intent of article VII, section 12. First, much of our case law in this area has been opaque and counterintuitive due to its complete divorce from the text of this constitutional provision. Cf. Cont'l Can Co., 151 So. at 490 ("Constitutions import the utmost discrimination in the use of language, that which the words declare is the meaning of the instrument." (emphasis supplied)). Here, the Court should not expand prior decisions from different contexts to advance a movement away from the text of article VII, section 12. The decision of the majority to do so today is contrary to a primary tenet of constitutional interpretation: Begin with the plain and clear meaning of the text. The original decision of this Court on September 6, 2007, which receded from the fundamentally erroneous "pledge of taxing power only" premise of Miami Beach within the context of typical capital projects (e.g., road construction), was a proper return to the constitutional mandate. See Strand v. Escambia County, 32 Fla. L. Weekly S587, S590-91 (Fla. Sept. 6, 2007), as revised, No. SC06-1894, 992 So.2d 150 (2007). Relatedly, the motions for rehearing and clarification filed by Escambia County and the amici have not added anything of substance to the cogent legal analysis contained within this Court's unanimous, context-specific decision to recede from the flawed premise of Miami Beach. Instead, these motions have impermissibly used rehearing as a means to reargue and attack the merits of this Court's decision, which we have previously considered and determined. Cf., e.g., Brennan v. State, 754 So.2d 1, 6 n. 4 (Fla.1999) ("Motions for rehearing may only be used to apprise a court of `the points of law or fact that the court has overlooked or misapprehended.'" (quoting Fla. R.App. P. 9.330(a))); Jacobs v. Wainwright, 450 So.2d 200, 201 (Fla.1984) ("A motion for rehearing shall not reargue the merits of the Court's order."). Nothing has changed in this case and nothing has been overlooked; the county and the amici calling for rehearing have simply pandered, postured, and expressed a self-serving *163 desire to thwart the democratic voice of Florida's citizens contrary to the text of the Florida Constitution.
Second, article VII, section 10 of the Florida Constitution ("Pledging Credit") further undermines application of the "pledge of taxing power only" premise of Miami Beach in the road-construction context presented here. This separate, distinct constitutional provision demonstrates that the framers of our Constitution were aware of, and intended a textual distinction between, an entity of local government "giv[ing], lend[ing] or us[ing] its taxing power or credit," as addressed in that constitutional provision, and an entity of local government issuing "bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation," as addressed in article VII, section 12. (Emphasis supplied.) If the framers had truly intended for article VII, sections 10 and 12 to each only address pledges of the taxing power of local government, then these constitutional drafters would have used similar language in section 12; however, they did not do so. Thus, the faulty premise of Miami Beach accomplishes that which we are proscribed from doing as judicial officers who have sworn to support, protect, and defend our state Constitution: It amends article VII, section 12 through judicial fiat by removing and rendering meaningless the phrase "payable from ad valorem taxation" and replacing it with materially different language drawn from a separate, distinct constitutional provision (i.e., article VII, section 10). Cf., e.g., Burnsed v. Seaboard Coastline R.R., 290 So.2d 13, 16 (Fla.1974) ("It is a fundamental rule of construction of our [C]onstitution that a construction... which renders superfluous, meaningless or inoperative any of its provisions should not be adopted by the courts.").
The People and the Legislature need not resort to the amendment procedures of article XI to overturn Miami Beach because the plain text of article VII, section 12 already unambiguously conveys a clear meaning. Like the hapless protagonist in "Groundhog Day," this Court will be forced to continuously relive this controversy until we "get it right" because the constitutional provision at issue simply does not support the gloss placed upon it by Miami Beach (which the majority erroneously expands to this road-construction context) and related, distinguishable decisions. Sooner or later we must recognize that the faulty expansion of Miami Beach to far different cases involving typical capital projects unjustifiably perpetuates an obvious legal error and deprives Florida's citizens of a clear constitutional right. Cf. Puryear v. State, 810 So.2d 901, 905 (Fla. 2002) ("Our adherence to stare decisis ... is not unwavering. The doctrine of stare decisis bends ... where there has been an error in legal analysis.").
When faced with a typical capital project, such as the road-expansion plan involved in this case, I would interpret and enforce article VII, section 12 as written and would also salvage and apply a long-forgotten portion of our Miami Beach decision: "The Court looks at the substance and not the form of the proposed bonds" to determine whether the entity of local government has complied with the Constitution. 392 So.2d at 894 (emphasis supplied). Where, as here, the bond-financing plan will inevitably lead to diverting funds from ad valorem tax revenue to pay for or "service" the associated long-term debt for a non-revenue producing capital project, the Constitution requires a referendum. See art. VII, § 12, Fla. Const; see also County of Volusia v. State, 417 So.2d 968, 972 (Fla.1982) ("That which may not be done directly may not be done indirectly." (citing State v. Halifax Hosp. Dist., 159 So.2d 231 (Fla.1963))); Frankenmuth Mut. Ins. v. Magaha, 769 So.2d 1012, 1023-26 (Fla.2000) (holding that computer lease-purchase *164 agreement, which would inevitably have required Escambia County to appropriate ad valorem taxes to make lease payments, violated article VII, section 12). Political expediency cannot alter the text of the Florida Constitution nor should it be used to thwart the will of the voters of this State.
Consequently, I believe that expansion of the "pledge of taxing power only" premise of Miami Beach to typical capital projects violates article VII, section 12, and that any associated local-government bond-financing plan that will inevitably lead to diverting funds from ad valorem tax revenue to service related long-term debt requires a referendum under our state Constitution. Thus, even if we uphold Miami Beach, Escambia County's tax-increment-financing scheme for this road-construction project nevertheless violates article VII, section 12. Unlike Miami Beach, which involved a redevelopment project under the auspices of the Community Redevelopment Act (part III of chapter 163, Florida Statutes (1975)), this case only involves a typical "capital project" within the meaning of article VII, section 12 (widening a county road). Furthermore, in contrast to Miami Beachwhere ad valorem tax revenue was only a contingent source from which the city planned to service the associated debt if the primary source proved insufficient-here, ad valorem tax revenue is the primary source[11] from which Escambia County will service the debt created by these bonds. This distinction brings the instant case squarely within the rule and rationale of County of Volusia and Magaha: Escambia County cannot circumvent the referendum requirement because its bond-financing scheme inevitably requires that it pay for its debt with ad valorem tax revenue.
The local-government shell game, which is played to avoid the Florida voter, should not be sanctioned by this tribunal. Unfortunately, we have done so today by improperly expanding this game to the very "capital projects" addressed in article VII, section 12. For these reasons, I join my colleague in dissenting from the majority's unjustifiable expansion of a fundamentally flawed principle, which operates to circumvent voter participation in a decision that requires popular approval under the Florida Constitution.
QUINCE, C.J., concurs.
NOTES
[1] The Ordinance defines "Tax Increment" as:

[T]he amount equal to the lesser of (a) the amount by which (i) the tax revenues that would have been generated at the millage rate in effect for the current Fiscal Year at the current Assessed Valuation exceeds (ii) the tax revenues that would have been generated at the millage rate in effect for the current Fiscal Year at the Base Assessed Valuation and (b) an amount equal to the sum of (i) 110% of the debt service of any outstanding indebtedness secured by the Tax Increment Revenues coming due in such Fiscal Year and (ii) an amount sufficient to restore any deficiencies in payment of debt service for such indebtedness for prior periods and to fund any planned expenditures described in Section 4(6) hereof.
Ordinance § 2.
[2] "Supplemental Revenues" are County revenues derived from a source other than ad valorem taxation on real and personal property that are appropriated and deposited into the Trust Fund in the event that the Trust Fund Revenues are not sufficient to pay the debt service on the bonds. Resolution art. I, § 101; art. III, § 304.
[3] "Pledged Funds" are "collectively, (i) the Trust Fund Revenues; (ii) the Supplemental Revenues, ... and (iii) except for moneys, securities and instruments in the Rebate Account, all moneys, securities and instruments held in the Funds and Accounts established by this Resolution." Resolution art. I, § 101.
[4] Article VII, section 12 of the Florida Constitution states:

Local Bonds.  Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
[5] Section 125.01, Florida Statutes (2006), states:

Powers and duties. 
(1) The legislative and governing body of a county shall have the power to carry on county government. To the extent not inconsistent with general or special law, this power includes, but is not restricted to, the power to:
....
(m) Provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities....
....
(r) Levy and collect taxes, both for county purposes and for the providing of municipal services within any municipal service taxing unit, and special assessments; borrow and expend money; and issue bonds, revenue certificates, and other obligations of indebtedness....
....
(w) Perform any other acts not inconsistent with law, which acts are in the common interest of the people of the county, and exercise all powers and privileges not specifically prohibited by law.
[6] In Penn we stated:

Under the ordinances, the bonds will be secured by lease payments from the city and county, which in turn are secured by tax increment revenues measured in part by future increases in ad valorem tax receipts. Any shortfall will be made whole by non-ad valorem revenues, but the bondholders' lien attaches only to monies actually deposited in the trust funds.
623 So.2d at 461.
[7] Likewise, we find that our decision in Frankenmuth Mutual Insurance Co. v. Magaha, 769 So.2d 1012, 1025 (Fla.2000), is distinguishable because in that case, we found that the size of the lease payments together with the consequences of the nonsubstitution clause in the lease-purchase agreements which were the subject of that action would eventually force the county to spend ad valorem taxes to make the lease payments. The present Ordinance and Resolution do not contain a clause similar to the nonsubstitution clause in Frankenmuth.
[8] I do not address the other issues presented in the majority opinion because they are moot in light of the unconstitutional nature of Escambia County's tax-increment-financing scheme.
[9] In relevant part, this provision reads as follows:

Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation....
(Emphasis supplied.)
[10] The plain and ordinary meaning of "payable from ad valorem taxation" unquestionably includes both the imposition of ad valorem taxes and the revenue derived therefrom. See 17 The Oxford English Dictionary 679 (2d ed. 1989) (Taxation: "2. The imposition or levying of taxes (formerly including local rates); the action of taxing or the fact of being taxed; also transf. [i.e., transferred sense] the revenue raised by taxes." (emphasis supplied)).
[11] During the trial-court evidentiary hearing, Escambia County's witnesses acknowledged that the tax increment from the designated district would constitute the primary repayment source. Further, one of these witnesses specifically described how the County would employ ad valorem tax revenue as the primary source of repayment:

What happens is they take the value of all the properties within the district at any given point in time, and as the values increase over time, 95 percent of the value of the growth portion only of the countywide revenues base they use the countywide millage rate against the growth portion and those funds are set aside for the increment.